**In re PETTIBONE CORPORATION, et al., Debtors.**

**Bankruptcy No. 86 B 1563–71.**

United States Bankruptcy Court, N.D. Illinois, E.D.

July 2, 1993.

Kevin T. Keating, McDermott Will & Emery, Chicago, IL, for Pettibone Corp.

Robert D. Kolar, Thomas M. Sheehan, Robert D. Kolar & Associates, Chicago, IL and M. Paul Gorfinkel, Rivkin Radler Bayh Hart & Kremer, Uniondale, NY, for debtor.

David E. Bennett, Vedder Price Kaufman & Kammholz, Chicago, IL, for PL Committee.

Andrew J. Maxwell, Maxwell and Pearlstein, Chicago, IL, for PL Trustee.

Kenneth J. Ready, Ready Pontisakos & Spiridakis, Garden City, NY and Richard L. Hirsh, Oak Brook, IL, for Robert Hawxhurst.

Paul E. Freehling, Pope Ballard & Shepard & Fowle, Chicago, IL and Kevin E. Cook, Mendes & Mount, New York City, for Allied.

Steven K. Mantione and Steven L. Sidney, Woodbury, NY, for TWA.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW ON MOTION OF ROBERT HAWXHURST FOR LEAVE TO FILE A LATE PROOF OF CLAIM AND FOR RECONSIDERATION OF PRIOR ORDER DISALLOWING CLAIM

JACK B. SCHMETTERER, Bankruptcy Judge.

### INTRODUCTION

Pettibone Corporation and its related entities ("Pettibone") emerged from their Chapter 11 proceeding herein by confirmation of debtor's Plan of Reorganization on December 9, 1988 ("Plan"). This Court retained jurisdiction to determine any claims disputes that arose under the Plan. The present issue relates to one of those disputes.

Claimant Robert Hawxhurst ("Hawxhurst") seeks to prosecute his personal injury complaint against Pettibone that was pending when this bankruptcy proceeding

was filed, so as to recover from available insurance. Under the confirmed Plan, the effect of his motion is also to seek the right to participate in distribution of Pettibone's assets as a Class 4 creditor.

Hawxhurst seeks leave to file a late proof of claim and modification of the statutory post-confirmation injunction imposed by 11 U.S.C. §§ 524 and 1141 as well as in the order confirming the Pettibone Plan. He also asks reconsideration of an Order entered March 11, 1988 which specifically disallowed his injury claim along with similar claims by others because those claims were not filed by a bar date earlier set by the Court. Hawxhurst thereby seeks to recover against Pettibone to the same extent as the other personal injury claimants who filed timely proofs of claim herein.

Pettibone opposed this motion, and evidence was taken thereon. The parties rested and final argument was taken. Having considered all the evidence and arguments of counsel, the Court by separate order entered today grants Hawxhurst's motion only to the extent that he is allowed to proceed against Pettibone as a nominal defendant in order to collect against the Pettibone insurance. However, he is thus allowed to proceed only to the extent that his claim does not diminish or interfere with recovery from insurance under the Plan by the personal injury claimants who filed timely proofs of claim. His motion to file late claim and for reconsideration of the order barring his late claim is denied, and he will not participate as a Class 4 creditor. As the basis for these rulings, the Court now makes and enters the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

### I. *Hawxhurst's Personal Injury Complaint*

On October 28, 1983, Hawxhurst registered his complaint against Pettibone and other defendants with the New York Supreme Court in Nassau County. It still pends. Hawxhurst alleged therein that, on or about January 6, 1982, he was injured when a tractor manufactured by Pettibone rolled over upon him. His complaint seeks damages from Pettibone under product liability theories and against other parties on various theories.

Hawxhurst's original attorney in that action was Mr. Charles Barnett. The attorney and client did not create or sign a written retainer agreement. However, both Hawxhurst and Barnett admit that the lawyer was empowered to take all necessary and appropriate steps to pursue the injury complaint to judgment or settlement and then to collect thereon. *See* Pettibone Ex. 14 (Deposition of Hawxhurst) at pp. 23 and 28:

Q: When you retained Mr. Barnett as your attorney, did you expect him to protect your interests with regard to the injuries you sustained?

A: Yes.

\* \* \* \* \* \*

Q: Did you in any way limit Mr. Barnett's authority to protect your interests?

. . . .

A: No.

\* \* \* \* \* \*

Q: ... did you in any limit Mr. Barnett in terms of what he was allowed to accept that would have an impact on your rights and possibility of recovery in your personal injury action?

. . . .

A: No.

*See also* Pettibone Ex. 11 (Deposition of Barnett), at pp. 9, 35–36:

Q: Do you understand there to have been any limits on the scope of authority that you had to represent Mr. Hawxhurst in pursuing the Defendants in collecting on any judgment?

A: I [Barnett] don't know of any.

\* \* \* \* \* \*

Q: Did you understand it to be among your duties in the prosecution of Mr. Hawxhurst's lawsuit to do what you considered to be necessary and proper towards Mr. Hawxhurst obtaining money damages against one or all of those defendants [in the state court suit]?

A: I would say yes.

. . . .

Q: Did you consider it your duty to receive them? Was that part of your job, to receive papers on [Hawxhurst's] behalf?

A: As it pertained to the case, yes.

## II. *Pettibone's Bankruptcy and Inaction of Hawxhurst's Initial Counsel*

Pettibone and its related entities filed petitions for relief under Chapter 11 of the Bankruptcy Code on January 31, 1986. Consequently, the injury action was stayed pursuant to 11 U.S.C. § 362. After that, notices relating to the bankruptcy were served on Hawxhurst's injury counsel.

Hawxhurst has argued here that Mr. Barnett was not authorized to receive or act upon any documents related to the Pettibone bankruptcy case. However, the evidence clearly contradicts this assertion. Hawxhurst never set any limit on Mr. Barnett's authority to act on matters related to his injury action. He simply hired Mr. Barnett to obtain and collect upon any judgment or settlement on account of his alleged injury. Mr. Barnett's broad grant of authority as attorney had to encompass matters in the bankruptcy case that affected Hawxhurst's case, since events and requirements here obviously affected Hawxhurst's ability to obtain or collect upon any judgment against Pettibone. An injury counsel may be obliged to take many steps outside of the court where the injury suit pends in order to protect the client. For example, if notice to a public agency is a statutory prerequisite, injury counsel must see that the required notice is served. Other examples come to mind. If relevant discovery is sealed in another court, or class actions jeopardize the client's independence of action, injury counsel may have to take steps in the other court. Likewise, the required action in this proceeding— here the single task of timely filing a one-page claim form so simple that a child could fill it out—was obviously necessary to protect fully Hawxhurst's right to maintain the claim on which suit was based. Mr. Barnett was broadly authorized to receive and act upon any documents he received in relation to Pettibone's injury case and therefore he was authorized to do the same as to bankruptcy notices that affected the injury case. He could not close his eyes to notices concerning the bankruptcy, and thereby expect to insulate himself and his client from the consequences of such disregard. But that is what happened.

On February 24, 1986, Pettibone's attorney in the Hawxhurst litigation sent Mr. Barnett a letter notifying him that Pettibone had filed its Chapter 11 petition in the Northern District of Illinois. Pettibone Ex. P. The letter further stated, "We submit that, pursuant to 11 U.S.C. § 362(a)(1), a stay of [*Hawxhurst v. Pettibone*] is automatically imposed by operation of law." *Id.* On February 21, 1986, Pettibone's general counsel mailed to Mr. Barnett "Notices of Section 341 Meeting and of Automatic Stay". Pettibone Ex. 5.

On September 8, 1986, and again on September 9, 1986, Mr. Barnett was served by mail, at his law office address shown on his Hawxhurst complaint, copies of a "NOTICE OF BAR DATE (LAST DAY) FOR FILING PROOFS OF CLAIMS". Hawxhurst Ex. 1. The notation "Robert Hawxhurst v. Pettibone Corporation" was written on the top left-hand corner of the front page. That notice warned creditors twice (once in underlined letters and once in all capitalized letters) that creditors "must file proofs of claims on or before October 31, 1986, or be forever barred from filing proofs of claims against the estates and from being treated as creditors for the purpose of voting and distribution." *Id.*

Despite receiving the foregoing personal letter and official notices, Mr. Barnett did not ever file a proof of claim or any other document or pleading with this Court on behalf of his client. Robert Hawxhurst was not a scheduled creditor, and therefore he was required to file a timely proof of claim under Fed.R.Bankr.P. 3003(c)(2).

In November of 1987, Pettibone's Official Unsecured Creditors' Committee ("Committee") filed a motion to disallow all the personal injury claims for which no proof of claim was filed. At this Court's insistence, notice of that motion and hear-

ing thereon was sent to all affected parties or their counsel. On January 12, 1988, counsel for the Committee mailed such notice to Mr. Barnett, stating (in capitalized letters) that "any party wishing to file an objection to the attached motion must do so by January 29, 1988". Pettibone Ex. O. No objection was filed or voiced in court on behalf of Hawxhurst. On March 11, 1988, the Committee's motion was granted. An order was entered disallowing all the claims of personal injury claimants listed in an exhibit to the order, Hawxhurst among them. Pettibone Ex. 1 ("Order"). That Order also stated, however, that it was "entered without prejudice to any party who can demonstrate that they did not receive notice of the Bar Date or of the Committee's Motion to Deem Certain Claims Disallowed to request reconsideration". *Id.* Mr. Barnett never responded to the Committee's motion, and, until the instant motion, no attorney representing Hawxhurst ever moved for reconsideration of the Order.

Mr. Barnett continued to represent Hawxhurst in his state court suit through some time after the March 11, 1988 Order. Subsequently, Hawxhurst replaced him with another attorney. Two attorneys later, Mr. Hawxhurst retained Mr. Kenneth Ready to be his counsel on January 17, 1991. While the evidence does not explain why the intervening attorneys did not recognize the issue (if indeed they received papers giving them notice of it), Mr. Ready recognized the problem faced by his client. He obtained counsel in Chicago to file and prosecute this instant motion.

The evidence showed that the communications and notices earlier referred to were sent to and properly addressed to Mr. Barnett at his law office. Hawxhurst has not demonstrated that Mr. Barnett failed to receive any of the communications or notices sent to him. Evidence clearly shows that Mr. Barnett received at least four separate notices or communications alerting him to Pettibone's bankruptcy and to Hawxhurst's impending loss of rights if a proof of claim were not timely filed.

The reason for inaction of counsel is not clear. There is some indication from Mr. Barnett's deposition testimony that he believed nothing could be recovered from the Pettibone bankruptcy estate. *See* Pettibone Ex. 11, pp. 20–21. For purposes of deciding the instant motion, it can be and is inferred that no proof of claim was filed because of either carelessness or an error in judgment on the part of Mr. Barnett, but he was not part of these proceedings and did not have an opportunity herein to explain his inaction.

### III. *Pettibone's Insurance and the Plan of Reorganization*

Prior to entering bankruptcy, Pettibone carried insurance to protect itself against products liability claims. The insurance was held in the form of separate policies covering each year's injuries. As in the case of Hawxhurst, when personal injury plaintiffs claimed to have been injured by a Pettibone product some time between October 22, 1981 and October 22, 1982 (the "81–82 policy year"), then they were covered by one particular set of policies. Pettibone carried separate layers of insurance. For the 1981–82 policy year relevant to Hawxhurst, Pettibone carried a large deductible known as a self-insured retention ("SIR"). To cover the first layer of liability above the SIR, Pettibone obtained pre-bankruptcy insurance from Northumberland General Insurance Company. For the next $5 million in liability beyond the Northumberland coverage, Pettibone obtained insurance from American Centennial Insurance Company. A third layer of coverage was obtained from another company for even larger liability.

In July of 1985, Northumberland was placed into insolvency proceedings, and its estate has been unable to satisfy Northumberland's remaining obligations under its policies with Pettibone. Part of Northumberland's coverage obliged it to defend Pettibone in personal injury suits. The excess insurers, including American Centennial, argued that they had no duty to defend. Consequently, Northumberland's liquidation left Pettibone with greatly increased exposure to personal injury liabilities and

no insurer to defend it in the many personal injury suits pending throughout the country.

One major achievement of Pettibone's reorganization effort was to negotiate a series of agreements with the excess insurers by which they agreed to defend Pettibone in these personal injury suits and to pay the claims up to their policy limits. One condition for this coverage, however, was that Pettibone had to meet fully its SIR before the excess insurers would pay out any claims. Another was that defense costs would be credited against the policy coverage. *See, e.g.,* Pettibone Ex. 4 (Pettibone's agreement with American Centennial). *See also In re Pettibone Corp. (Port Terminal Railroad Assoc. v. Pettibone Corp.),* 138 B.R. 210 (Bankr.N.D.Ill.1991), and *In re Pettibone Corp. (Official Creditors' Committee of Products Liability and Personal Injury Claimants v. International Ins. Co.),* 121 B.R. 801 (Bankr. N.D.Ill.1990) (both discussing the agreements in the context of a controversy arising over the treatment of personal injury claimants covered by the 1984–85 policy year).

These agreements were subsequently incorporated in Pettibone's consensual Plan of Reorganization, later confirmed. The interests of personal injury claimants were guarded in negotiations by a special Official Committee of Personal Injury Claimants who obtained important benefits for those claimants. Under the Plan, personal injury claimants are divided into groups by each policy year that covered their claims. Pettibone Ex. 2 (Pettibone's Plan); *see also Pettibone,* 138 B.R. at 213. The timely filed personal injury claimants in each group share pro rata the burden of Pettibone's SIR for their policy year and hold unsecured claims for their shares of that. *Id.* These unsecured claims will result in some proportionate recovery out of a Note Pool funded by annual payments from reorganized Pettibone and any recovery from the insolvent Northumberland estate, as Class 4 claimants under the confirmed Plan. *See* Pettibone Ex. 2 (Article VI of the Plan). If the aggregate of their claims (as liquidated or settled in state court proceedings) exceeds the SIR for the relevant policy year, the claimants recover the excess over SIR by sharing pro rata in the proceeds of available insurance up to the limit of such insurance for that year (net of defense costs expended). *Id.*

For the policy claim year running from October 22, 1981 to October 22, 1982 ("1982 policy year"), the insurance company with liability under the agreement with Pettibone is American Centennial Insurance Company. This company is the carrier on a policy of insurance for $5 million ultimate net loss. That means that the liability of the insurance carrier is limited to the indemnity amount after deducting its defense expenses, for a total of $5 million. The effective SIR for this policy year is $773,-835.32. The claimants whose claims have thus far been settled or liquidated against the policy year are:

| Claimant | Amount |
| --- | --- |
| George Adair | $102,000.00 |
| John Balcorta | $ 40,000.00 |
| Bruce Burton | $110,000.00 |
| Clifton Caldwell | $155,000.00 |
| Terrence Clausia | $ 29,500.00 |
| Lance Coleman | $162,500.00 |
| Thomas Draher | $250,000.00 |
| Homer Sours | $212,000.00 |
| TOTAL | $1,061,000.00 |

There are claimants other than Hawxhurst whose suits pending for that claim year and whose claims have not yet been settled or liquidated:

Vicky Melhorm
Tryce Munnelly
Earl Pollard
George Scott
Charles Thomas

## IV. *Pettibone's Arguments*

Pettibone argues that the agreements to defend from its excess insurers were obtained because the number of claims

against Pettibone was then fixed at the number of filed proofs of claims, so the insurers could roughly compute their exposure. However, while the claims bar filing date was October 31, 1986, the agreement between Pettibone and American Centennial was executed on May 12, 1987, long before the Committee motion to disallow unfiled claims was filed in November of 1987 and allowed March 11, 1988. American Centennial could not have known with certainty, when it entered into the agreement, whether or not more claims would be filed with leave of Court. Indeed, the insurance agreement to defend, as well as the Plan, left open the possibility of allowance of future claim filing. Furthermore, when Pettibone filed its bankruptcy petition, it had $773,835.52 of unused SIR for the 1981–82 policy year. Schedule III of the confirmed Plan lists eighteen filed proofs of injury claims seeking $20,913,516, in the aggregate. Pettibone Ex. 2. Accordingly, American Centennial had a powerful incentive to enter into the agreement so as to defend against those claims which threatened its policy limit, regardless of whether or not any unfiled claims were subject to disallowance.

Pettibone further argues that its ability to complete the reorganization will be affected by allowing the unfiled claimants to proceed against it to collect on insurance. Pettibone's premiums are based on its claims history. It contends that allowing any unfiled claims to be filed late and to proceed on their suits would cause the claims history to change for the worse. Consequently it argues that premiums for future policy years would rise, and Pettibone would be required to set aside larger reserves to cover larger SIRs to avoid even higher premiums. However, the evidence did not show that rising premiums would force Pettibone back into bankruptcy or otherwise materially affect its solvency, or affect execution of its confirmed Plan at all. Moreover, the weight of evidence did not demonstrate that any impact on its premiums would materially differ from the anticipated impact of claims on premiums under normal business conditions. Further, all evidence on the subject was broad-brush general testimony offered by a Pettibone officer. While he has considerable knowledge about premiums charged in the past, he gave few details about future impact, and no insurance representative or actuary testified to the certainty or extent of impact.

This testimony offered by Pettibone came from Mr. Douglas Johnson, a Pettibone executive. Mr. Johnson stated that premiums for future years are based on past claims experience. So he speculated, based on prior experience of the debtor, that an increase in claims for each product would increase future premiums to cover that product. In the absence of testimony from insurance actuaries or other analysts in the insurance industry, the Court cannot attach great weight to this general testimony. Moreover, it appears that the product in question in the Hawxhurst case is no longer in production.

How a potential insurer would specifically weigh the history of a claim by Hawxhurst on a machine no longer in production cannot be determined based solely on the testimony by Mr. Johnson. It is true that insurance companies do consider discontinued product lines in fixing premiums for product liability insurance for Pettibone, and that available insurance is essential to the reorganized Pettibone. However, the extent of impact on future premiums is at best indefinite and speculative on this record.

This feisty and viable reorganized business has shown no economic reason why it should now be insulated from normal insurance premiums based upon product history. Also, neither the Plan nor claims bar date provided such insulation.

Pettibone also argues that many years have passed, and there would be great difficulty now in researching the relevant facts and arranging a defense, and that this amounts to prejudice in the injury case. This argument has no merit based on the facts here. The Hawxhurst action started in October 7, 1983, the bankruptcy not filed until January of 1986. During the bankruptcy proceedings, it was clear, at least until the bar date of October 31, 1986,

that the Hawxhurst case might have to be defended. If Pettibone's counsel took inadequate steps to gather defensive documents and information during those three years, the burden of that difficulty is not attributable to Hawxhurst. Moreover, Pettibone has not demonstrated that any evidence available during those three years later became unavailable because of Hawxhurst's subsequent delay. Accordingly, this claim of prejudice has no merit.

Pettibone's final assertion of prejudice relates to American Centennial's defense against the injury suits pursued by the timely filed claimants. At trial, Pettibone produced evidence to show that American Centennial made an estimate of Pettibone's aggregate potential liability as to the timely filed claims in the 1981–82 policy year. Pettibone further produced evidence to show that this aggregate liability was then compared to the SIR available to pay these claims in order to estimate American Centennial's out-of-pocket exposure for the 1981–82 policy year. This estimate was then relied upon to settle these claims. For example, it was asserted that the claim of George Adair was "clearly defensible". However, that case was nevertheless settled for $102,000 because the settlement was said by the witness to cost American Centennial only $30,000 in resulting payment under the Plan, while a trial would have cost more than that. Pettibone goes on to argue that, from any order allowing Hawxhurst to proceed against insurance, it would suffer prejudice in the form of defenses foregone in other claimants' injury cases previously settled. This evidence was entirely self-serving and conclusory. Few details were given about the settled cases as to liability or injury.

Even if taken at face value, this evidence only arguably supports an assertion of prejudice against the insurer American Centennial. It does not in any way support an assertion that Pettibone itself would be prejudiced or that its assets would be affected. As discussed below in the Conclusions, an insurer's inability to take advantage of the windfall created when a claimant fails to comply with a bar date in bankruptcy is not relevant.

## CONCLUSIONS OF LAW

### Jurisdiction

This matter is before the Court pursuant to 28 U.S.C. § 157 and Local District Rule 2.33. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b) and this is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (B).

### I. Hawxhurst May Not File a Late Proof of Claim Under Fed.R.Bankr.P. 3003(c)(3) or 9006(b)(1)

The time for filing a proof of claim in a Chapter 11 case is set by Fed.R.Bankr.P. 3003(c)(3), which provides that "[t]he court shall fix and for cause shown may extend the time within which proofs of claim ... may be filed." Pursuant to this rule, the Court set a bar date for Pettibone's creditors. The purpose of a claims bar date is "to enable the debtor and [its] creditors to know, reasonably promptly, what parties are making claims and in what general amounts." *Matter of Stavriotis*, 977 F.2d 1202, 1205 (7th Cir.1992), *quoting In re Kolstad*, 928 F.2d 171, 173–74 (5th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 419 (1991).

However, consistent with Rule 3003(c)(3) and the purpose behind claims bar dates, the Court may allow a claim to be filed after the bar date has passed. The relevant factors previously considered in this proceeding when determining whether to allow late filed claims were set forth in *In re Pettibone Corp. (Pettibone v. Payne)*, 151 B.R. 166 (Bankr.N.D.Ill.1993); *In re Pettibone Corp. (Pettibone v. United States)*, 151 B.R. 156 (Bankr.N.D.Ill.1992); and *In re Pettibone Corp. (claim of Rodney Hunt)*, 123 B.R. 304 (Bankr.N.D.Ill. 1990). They were: "(i) the reason for the delay; (ii) the length of the delay; (iii) whether the debtor was prejudiced by the delay; (iv) the debtor's knowledge of the claim; and (v) the good faith of the creditor." *Id.*, 123 B.R. at 308, *citing In re Jartran, Inc.*, 76 B.R. 123, 126 (Bankr. N.D.Ill.1987).

■ More recently, the Supreme Court emphasized that Fed.R.Bankr.P. 9006(b)(1)[1] applies when considering whether to allow a late filed claim. *Pioneer Investment Services Co. v. Brunswick Associates L.P.*, —— U.S. ——, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993). That case involved a Chapter 11 debtor that sent notice of the bar date to the president of the corporate general partner of Brunswick Associates. The notice was referred to its counsel, but that counsel failed to file a proof of claim before the bar date. Brunswick later moved for leave to file a late proof of claim. The opinion observed that, under Rule 9006(b)(1), leave should be given to file untimely proofs of claims if failure to meet the bar date is the result of "excusable neglect". *Id.* at 1491–92.

In discussing what "excusable neglect" means, opinion first pointed out that:

> by empowering the courts to accept late filings 'where the failure to act was the result of excusable neglect,' Rule 9006(b)(1), Congress plainly contemplated that the courts would be permitted, where appropriate, to accept late filings caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control.

*Id.* at 1495. The Court then determined that an equitable inquiry should be made to decide whether a particular instance of neglect should be found excusable. *See Id.* ("Rule 9006's allowance for late filings due to 'excusable neglect' entails a correspondingly equitable inquiry"). The Supreme Court described the factors to consider in this inquiry as including:

> the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.

*Id.* at 1498.

■ Examination of those considerations in this case clearly weighs against allowing Hawxhurst to file a late proof of claim. The neglect was within control of movant's counsel, the delay was about four years after the Order of disallowance, and granting of the motion might reduce available insurance and would necessarily reduce somewhat Class 4 assets to be available to timely injury claimants, thus prejudicing them. Those factors are strong grounds for denial of the request to file late claims.

There was no justification for Hawxhurst's failure to file a timely proof of claim. His attorney received several notices concerning the bar date, yet that attorney consciously or carelessly ignored them. Hawxhurst argues that the several notices to him were all defective because they were never sent to him personally. This argument has no merit. It is well established that notice to a party's attorney constitutes notice to that party. *Irwin v. Veterans Administration*, 498 U.S. 89, 92–93, 111 S.Ct. 453, 456, 112 L.Ed.2d 435 (1990), *quoting Link v. Wabash R. Co.*, 370 U.S. 626, 634, 82 S.Ct. 1386, 1390, 8 L.Ed.2d 734 (1962) ("[u]nder our system of representative litigation, 'each party is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney' "); *McKinney v. Waterman S.S. Corp.*, 925 F.2d 1, 5 (1st. Cir.1991); *In re Glow*, 111 B.R. 209, 218 (Bankr.N.D.Ind. 1990). *Cf.* Fed.R.Civ.P. 5(b) and Fed. R.Bankr.P. 7005 ("Whenever under these rules service is required or permitted to be made upon a party represented by an attorney the service shall be made upon the attorney unless service upon the party is ordered by the court"). Therefore, Mr. Hawxhurst effectively received those notices.

The Supreme Court has consistently held that "clients must be accountable for the acts and omissions of their attorneys." *Pioneer Investment Services v. Brunswick*

---

1. Rule 9006(b)(1) provides in relevant part that when an act is required or allowed to be done at or within a specified period by these rules or by a notice given thereunder or by order of court, the court for cause shown may at any time in its discretion ... on motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect.

*Associates*, —— U.S. at ——, 113 S.Ct. at 1499. *See also Link v. Wabash R. Co.*, 370 U.S. at 633, 82 S.Ct. at 1390 ("[t]here is certainly no merit to the contention that dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client"); and *United States v. Boyle*, 469 U.S. 241, 105 S.Ct. 687, 83 L.Ed.2d 622 (1985) (held that a client could be penalized for counsel's late filing of a tax return). The reason for this rule is clear:

> Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation.

*Link*, 370 U.S. at 633–34, 82 S.Ct. at 1390. Therefore, Mr. Barnett's error in not responding to the notices sent by Pettibone is attributable to Hawxhurst personally.

It must be said that the length of the Hawxhurst delay in this case was extraordinary—over four years between the date of the Committee's notice of motion and the filing of this motion. The reason for this delay is either a careless neglect or conscious decision on the part of one or more of Hawxhurst's attorneys to do nothing in this proceeding. It is unfortunate and disturbing that this lack of reaction to bankruptcy notices is so common among injury and commercial attorneys. In this case alone, almost one-quarter of the many counsel representing injury claimants around the country failed to file timely claims herein after receiving the same notices as were sent to this claimant's counsel.

Allowing Hawxhurst to file a late proof of claim in this case would, moreover, clearly affect Plan administration adversely to the interest of timely injury claimants to share in the Class 4 Note Pool. If Hawxhurst had an allowed claim, then he would participate in the distribution from that Note Pool on a pro rata basis at the expense of the timely injury creditors. The finite pool to be available for all Class 4 creditors will be divided among many persons, and those who complied with the Bankruptcy Rules and filed timely proofs of claims should not be prejudiced by having Hawxhurst share in that Pool. Nor should he be able to share in insurance proceeds if that would prejudice timely claimants. (See Footnote 2, p. 233.)

In *Pioneer*, the neglect was found to be "excusable" because other factors were present, including the obscure way in which notice was given there and the lack of prejudice there to debtor or other creditors in the case from allowing a late claim. *Id.* at ——, 113 S.Ct. at 1499–1500. Those factors are not present here. Not only were the notices here crystal clear but, as previously discussed, a late filing could prejudice the timely filed claimants. Reading the "danger of prejudice to the debtor" test in *Pioneer* to include prejudice to debtor or its creditors, it is clear that Hawxhurst should not be allowed to file a claim under Fed.R.Bank.P. 3003(c)(3) and 9006(b)(1). Such delay has "potential impact on judicial proceedings" through impacting on Class 4 distribution and perhaps even insurance availability in the policy year unless the late claim is barred.

## II. Reconsideration of the Order Denying Hawxhurst's Claim Is Not Warranted Under Fed.R.Civ.P. 60(b) (Fed. R.Bankr.P. 9024)

As part of his request for the right to file a late claim, Hawxhurst requests reconsideration of the Order of March 11, 1988, that denied his claim. The request for reconsideration requires a separate analysis.

On March 11, 1988, this Court entered an order disallowing certain claims against Pettibone. Robert Hawxhurst's claim was among those encompassed within that ruling. Hawxhurst did not appeal from that order, which has long since been final as to him. *See In Re Wade*, 991 F.2d 402, 406 (7th Cir.1992) ("Several types of bankruptcy orders are final and appealable, for example, orders allowing or denying claims"). While the Court effectively reserved jurisdiction in that order to reconsider claims by any party who could demonstrate non-re-

ceipt of bar date notice or the Committee's Motion to deem claims disallowed, Hawxhurst does not seek to come within that exception, and certainly has not proved that he does.

Reconsideration of orders allowing or disallowing claims is authorized by Fed. R.Bankr.P. 3008, which provides:

A party in interest may move for reconsideration of an order allowing or disallowing a claim against the estate. The court after a hearing on notice shall enter an appropriate order.

*See also* 11 U.S.C. § 502(j) ("A claim that has been allowed or disallowed may be reconsidered for cause....")

Fed.R.Bankr.P. 9024 governs the timing and standards with respect to motions for reconsideration of orders allowing or disallowing claims. Rule 9024 provides that, with certain exceptions not relevant here, Rule 60 of the Federal Rules of Civil Procedure applies to motions "for the reconsideration of an order allowing or disallowing a claim against the estate...."

■ This Court can reconsider its now-final order disallowing Hawxhurst's claim only if Hawxhurst can establish one of the grounds for relief from the order that are set forth in Rule 60. Rule 60(a) pertains to clerical mistakes in judgments or orders and is inapplicable here. Hawxhurst's motion is governed by Rule 60(b), which provides in pertinent part:

On motion and upon such terms as are just, the court may relieve a party ... from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud, misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief

from the operation of the judgment. The motion shall be made within a reasonable time....

The Seventh Circuit has emphasized that "Rule 60(b) provides for extraordinary relief and may be invoked only upon a showing of exceptional circumstances." *Peacock v. Board of School Comm'rs*, 721 F.2d 210, 213 (7th Cir.1983) (*per curiam*). *See also McKnight v. United States Steel Corp.*, 726 F.2d 333, 335 (7th Cir.1984).

■ Hawxhurst has failed to address the applicability of Rule 60(b) to his motion or discuss any grounds thereunder. Of the six enumerated grounds for relief from a judgment or order stated in Rule 60(b), the only ground that is arguably suggested is the first ground. However, that ground is not applicable here.

To satisfy the first ground for relief contained in Rule 60(b), Hawxhurst would have to demonstrate that the March 11, 1988, order was a product of "mistake, inadvertence, surprise, or excusable neglect." Hawxhurst has argued in another context that he should not be saddled with the consequences of his attorney's failure to file a timely claim in the Pettibone bankruptcy. However, as earlier discussed, he is so saddled and excusable neglect has not been demonstrated.

The *Pioneer* principles regarding the meaning of "excusable neglect", for purposes of a motion for leave to file a late claim under Bankruptcy Rule 9006(b)(1), must by analogy apply to a motion for reconsideration of an order disallowing a claim under Bankruptcy Rules 3008 and 9024 and under Fed.R.Civ.P. 60(b). Accordingly, Hawxhurst is again unable to establish "mistake, inadvertence ... or excusable neglect" by asserting that he should not be held accountable for the mistake of his attorney.

■ Finally, because Hawxhurst failed to bring his motion within a reasonable time, he would not be entitled to relief under Rule 60(b), even if he could satisfy one of the six grounds contained in that rule. Hawxhurst did not file his motion seeking leave to proceed with his claim

against Pettibone until nearly four years after the order was entered disallowing his claim and almost three years after Pettibone's Chapter 11 Plan was confirmed. As the Supreme Court once observed in rejecting an attempt to set aside a judgment under Rule 60(b), "[t]here must be an end to litigation someday...." *Ackermann v. United States*, 340 U.S. 193, 198, 71 S.Ct. 209, 211–12, 95 L.Ed. 207 (1950). Under circumstances where his late filing postconfirmation would prejudice the rights of timely claimants under the Plan, Hawxhurst failed to bring his motion to reconsider within a reasonable time.

### III. *Hawxhurst May Proceed Against Pettibone to Collect from Insurance Notwithstanding His Inability to File a Late Proof of Claim*

■ The ruling that denies Hawxhurst's motion to file an untimely proof of claim does not end the discussion. The next issue is whether Hawxhurst has a right to pursue an action which post-confirmation only names Pettibone nominally in order to collect on its insurance. The Seventh Circuit has spoken on this issue several times in the last two years.

In *Matter of Fernstrom Storage and Van Co.*, 938 F.2d 731 (7th Cir.1991), a fire at debtor's warehouse destroyed a claimant's property. The debtor subsequently filed a petition for relief under Chapter 11. The claimant was listed on the debtor's schedules for a debt that was unrelated to the fire damage, and the claimant filed a proof of claim for that other debt. However, it failed to file a proof of claim for the fire damage. Two years after the petition was filed, the claimant filed an action in the federal district court seeking compensation for the fire damage. Six years later, the debtor moved to dismiss the claim, arguing that it was stayed by the bankruptcy. The claimant then moved to modify the stay in order to continue the suit.

The Seventh Circuit affirmed the bankruptcy court's order modifying the stay, holding that "[claimant's] failure to file a claim should not bar it from recovering

against [debtor's] insurer." *Id.* at 733. The basis for this holding is that:

'The purpose of the proof of claim is to alert the court, trustee, and other creditors, as well as the debtor, to the claims against the estate.' [citations omitted].... the creditor holding the claim for which no proof of claim was filed has agreed that all it will seek from the debtor is a determination of liability. This determination will neither deplete the debtor's assets or otherwise interfere with the administration of the bankruptcy proceeding, nor hinder the debtor's fresh start at the close of the proceeding. Rather, it will operate only as 'a prerequisite to recovery against another entity.' [citation omitted] In such a situation, the notice function served by the rule that only proven claims will be allowed to share in the distribution is not frustrated by allowing a creditor that has not filed a proof of claim to proceed against the debtor.

*Id.* at 734. *Fernstrom* held that "debtors-defendants suffer little prejudice when they are sued by plaintiffs who seek nothing more than declarations of liability that can serve as a predicate for a recovery against insurers, sureties, or guarantors." *Id.* at 736.

It should be noted that *Fernstrom* was a Chapter 11 case, albeit prior to reorganization. The possibility of post-petition increase in insurance rates (argued here by Pettibone to be significant prejudice) was inherent in *Fernstrom* as here, although not discussed in that opinion.

Likewise, in *Matter of Shondel*, 950 F.2d 1301 (7th Cir.1991), the claimant filed a wrongful death claim against a defendant who later filed a petition for relief under Chapter 7. This claimant knew of the bankruptcy, but she took no action. The debtor-defendant subsequently received a discharge, and then moved to dismiss the wrongful death claim. Almost a year and a half later, the claimant moved to reopen the bankruptcy case so that the permanent injunction under 11 U.S.C. § 524 could be modified to allow her to proceed against

the debtor-defendant for the purpose of collecting against debtor's insurer.

The bankruptcy court reopened the case and modified the statutory injunction under 11 U.S.C. § 524 to allow the claimant to pursue her wrongful death claim, but only to the extent that the debtor would only be held nominally liable and all recovery would come from debtor's insurer. The Seventh Circuit affirmed, relying upon *Fernstrom*. The court found *inter alia* that, "since the modified injunction prohibits any recovery from [debtor] personally, she is not harmed or seriously prejudiced by the reopening." *Id.* at 1304. The court also held the § 524 injunction "does not preclude a determination of the debtor's liability on the basis of which indemnification would be owed by another party." *Id.* at 1306.

Finally, in *Matter of Hendrix*, 986 F.2d 195 (7th Cir.1993), the claimants had a personal injury claim against a Chapter 7 debtor. The claimants received notice of the bankruptcy case, but failed to file a proof of claim. The debtor was later discharged, and a summary judgment was granted against the claimants in their personal injury action because of that discharge. Like the claimant in *Shondel*, these claimants also moved to reopen the case and have the § 524 injunction modified so as to allow them to proceed in the personal injury case to collect against the debtor's insurer.

The primary thrust of the *Hendrix* opinion was a holding that the claimants had standing to move in bankruptcy court to modify the injunction. *See id.* at 197–200. However, the opinion started by reiterating the holding in *Shondel*, stating, "as to whether such an injunction extends to a suit only nominally against the debtor because the only relief sought is against his insurer, the cases are pretty nearly unanimous that it does not." *Id.* at 197, *citing Shondel*, 950 F.2d at 1306–09, and *Fernstrom*, 938 F.2d at 733–34. Thus, in *Hendrix*, the injury claimant was not obliged to ask the bankruptcy Judge for any relief in the Chapter 7 case in order to proceed only against insurance and not assets of the debtor. *Cf. Hendrix*, 986 F.2d at 197 ("the

discharge did not in fact prevent the [claimants] from proceeding in state court against [the debtor], provided they were seeking only the proceeds from [debtor's] insurance policy").

In light of these three opinions in this Circuit, Hawxhurst clearly has the right to pursue his personal injury action against Pettibone for possible recovery against insurance, notwithstanding his inability to file a late proof of claim.

Unlike *Hendrix*, however, Hawxhurst may not pursue his action to judgment without any order from this Court, because the effect of that might free him to grab insurance proceeds at the expense of timely claimants—to recover from the limited insurance due or to become due to timely injury claimants under the Plan. However, it is clear in this case that he can proceed with his suit against Pettibone as a nominal defendant in that action, if he does not recover from non-insurance assets and does not diminish insurance recoveries of timely claimants. *See Fernstrom*, *supra*, at 734 (finding that a proof of claim is unnecessary only where recovery will not "deplete the debtor's assets or otherwise interfere with the administration of the bankruptcy proceeding, nor hinder the debtor's fresh start at the close of the proceeding").

This will be accomplished by an order modifying the § 524 and § 1141 injunction, but containing provisions that limit Hawxhurst's recovery. Since he cannot collect as a timely claimant, he may not recover any funds that come from Pettibone or that are to be shared among claimants who have filed timely proofs of claims. He therefore cannot recover anything from the Note Pool as a Class 4 claimant. Should Hawxhurst recover a money judgment in his favor, he will only be allowed to collect against Pettibone's insurer, but subject to the same procedures and limits under the confirmed Plan as if he had filed a timely claim herein.

A further limit is that Hawxhurst may only collect his pro rata share of available insurance to the extent that the amount of available insurance exceeds the aggregate of the allowed claims of timely claimants

against the insurance for his policy year. If timely claimants would receive all available insurance before considering Hawxhurst, he may not cut into their entitlements under the Plan. The PL Trustee (who administers the PL trust that disburses net available insurance proceeds) must not allow recoveries by timely claimants of insurance to be diminished in any way by Hawxhurst's recovery.[2]

Apart from preventing Hawxhurst from impairing the recovery of timely claimants, these limitations have the benefit of ensuring that Hawxhurst does not receive any benefit from his failure to file a timely proof of claim. He contends he should be allowed to recover 100% of any settlement or judgment from available insurance proceeds. However, that would be a better recovery than that of claimants who filed timely proofs of claim and who must recover only a portion of their liquidated claims from limited insurance and another portion out of Pettibone's SIR Note Pool.

■ Consistent with this principle that Hawxhurst cannot recover more than the Plan allows, Hawxhurst will also not be allowed any post-judgment interest, because post-judgment interest on judgments is disallowed for claimants who filed timely proofs of claims. *See In re Pettibone Corp. (claim of R & L Bursch)*, 151 B.R. 178 (Bankr.N.D.Ill.1993) (held that claimants are not allowed to collect post-judgment interest on their personal injury claims notwithstanding the availability of insurance because they gave up this entitlement in the Plan). In recovering insurance, Mr. Hawxhurst is also to be limited

by the Plan's procedural terms, despite his disregard of the bankruptcy process.

The foregoing limitations are certainly fair and consistent with the principles set out in *Fernstrom, Shondel,* and *Hendrix.* Hawxhurst's recovery will be limited to what he could receive without the benefit of a timely proof of claim, and he will not be allowed to benefit by gaining any advantage over other claimants by his failure to timely file a proof of claim. Furthermore, Pettibone will not be materially affected by Hawxhurst's claim, and other creditors cannot be impaired by it. Pettibone will only be a nominal defendant to Hawxhurst's continued suit, and any recovery by him will be pro rata from available insurance, but not to the extent that his claim can diminish the insurance recovery of others.

Apart from various claims of prejudice earlier discussed, Pettibone argues that it will suffer prejudice despite being a nominal defendant because of costs of cooperating with its insurer in defending the injury suit. However, this obligation to cooperate with the insurer is always present, a factor clearly present in *Fernstrom, Shondel,* and *Hendrix.* This consideration cannot bar the application of the *Fernstrom* doctrine.

Finally, Pettibone's insurer for Hawxhurst's policy year will not actually be prejudiced because it will simply be paying what it originally agreed to pay in its insurance policy. As several courts have noted,

> [I]f an insurance company is as a matter of state law liable to a plaintiff in a personal injury action, subsequent discharge of the assured in bankruptcy does

---

**2.** To oversimplify, the following scenarios show that it is possible, though not likely, that Hawxhurst's recovery could threaten the recovery of insurance proceeds by others in the absence of this restriction:

> *First Example:*
> Assume timely claims other than Hawxhurst recover judgments totalling $6 million against available insurance of $5 million. After deducting the aggregate SIR of about $750,000 (rounded off), and assuming defense costs of $250,000, the insurance layer of $5 million, reduced by expenses to $4,750,000, would be available to distribute pro rata among $5,250,000 of judgment claims ($6 million less the SIR). In this hypothetical, allow-

ing Hawxhurst to recover anything from insurance would deprive others of some part of their share of the limited insurance.

> *Second Example*
> Most of the claimants in this policy year have liquidated their claims at just over $1 million. Should the others liquidate at $1 million more, without Hawxhurst there would be ample insurance ($4,750,000 after assumed defense costs) to pay $1,250,000 after deducting the SIR. Should Hawxhurst recover $500,000, there would still be ample insurance proceeds available to share pro rata among all the claimants, including him. In this instance, his presence in the pool would not impair the recovery of others.

not alter the obligation of the insurance company. It seems clear that it is the policy of the law to discharge the bankrupt but not to release from liability those who are liable with him.

*In re Jet Florida Systems, Inc.,* 883 F.2d 970, 976 (11th Cir.1989), *quoting In re Bracy,* 449 F.Supp. 70, 71 (D.Mont.1978). *See also In re White,* 73 B.R. 983, 985 (Bankr. D.Colo.1987), and *In re Mann,* 58 B.R. 953, 957 (Bankr.W.D.Va.1986) (supporting this position). The insurer is not being called upon here to pay more than it would otherwise be liable to pay under its insurance agreements with Pettibone and the confirmed Plan.

## IV. *This Court Does Not Lack Jurisdiction*

█ Debtor argues in its final brief that this Court lacks jurisdiction to modify the § 524 injunction to permit Hawxhurst to proceed against Pettibone's insurance. The argument may be summarized thus: That the Order of March 11, 1988 is final against Hawxhurst, that it was not appealed, that once it is decided that a late claim may not be filed and the Order may not be reconsidered under Rule 60(b), then the Court lacks jurisdiction to change the effect of that Order barring the Hawxhurst claim. From that syllogism, debtor makes a large and untenable leap from logic. It argues that, because it was decided with finality that Hawxhurst may not proceed as a claimant—for that is what the March 11, 1988 Order said and this opinion reaffirms—therefore he may not proceed against insurance under *Fernstrom* principles.

However, the thrust of *Fernstrom, Shondel,* and *Hendrix* is that to proceed against a debtor's insurer one need not be a claimant. Hawxhurst is not a claimant in bankruptcy, late or otherwise, but he may still proceed against debtor's insurance within the limits set. The finality of the 1988 Order in no way deprives the Court of jurisdiction to modify the § 524 and § 1141 injunction as indicated. Allowing suit against Pettibone as a nominal defendant is not the same as allowing a barred claim in this estate.

Moreover, under terms of the confirmed Plan and Order of Confirmation, this Court clearly reserved jurisdiction to entertain the instant motion. The Order of Confirmation provides on pages 10 and 11, paragraph 4, that the Automatic Stay under § 362 and the Injunction under § 524 were modified to permit PL claimants

to prosecute their PL Claims as identified on Schedule 3 of the Plan *or as authorized to be filed in the case by Order of the Court,* to settlement or judgment in order to fix the amount of their respective allowed claims shall be effective upon the expiration of the effective date.

(Emphasis added.)

The meaning of this provision of the Order of Confirmation is clear. In addition to PL claimants identified and defined by the Plan, the Court had the authority to authorize such claims to be filed in the case subsequent to confirmation, within bounds and restrictions earlier discussed herein.

Moreover, Paragraph 18 of the Order of Confirmation provides that the Court shall retain jurisdiction for the purposes set forth in Section 9.08 of the Plan. That section in its subparagraphs provides in part (e) that the Court retains exclusive jurisdiction to hear and determine matters arising in connection with the PL Trust or its implementation, including the rights and obligations under the PL insurance policies and the PL insurance agreements of the PL insurers, any PL claimants and the PL Trustee; in part (g) to enter orders enforcing and implementing the Plan and to resolve disputes arising under or in connection with the Plan; and in part (h) to correct any defect, cure any omission or reconcile any inconsistency or ambiguity in the Plan, the Confirmation Order, or any document executed or to be executed in connection therewith, as may be necessary to carry out the purposes and intent of the Plan, provided the rights or any holder of any allowed claim or an allowed interest are not adversely affected thereby.

The aggregate meaning of these provisions is clear. Mr. Hawxhurst is an individual with a claim arising out of a product liability incident. As a threshold matter, he had standing to ask to be treated as a

PL claimant, and the Court retained jurisdiction to pass on all aspects of that application.

### CONCLUSION

Accordingly, by Order entered separately this day, Hawxhurst's motion to file late claim is denied, but the injunction under 11 U.S.C. § 524 and § 1141 is modified to allow him to proceed nominally against Pettibone in his litigation in order to recover against insurance proceeds subject to the limitations discussed herein.

Pettibone makes an additional point that reminds us that more litigation may lay ahead. It suggests there is uncertainty as to whether the insurer will in fact defend the Hawxhurst claim or seek to raise some defense under the policy, under its agreement, or under the Plan. Since insurance-funded counsel represent Pettibone in this contested matter, we can take that to be more than idle speculation. That potential cloud on the horizon may well bring yet another lawsuit on for determination, one directly including the insurer. However, the possibility of a policy defense is inherent in every situation under the *Fernstrom* line of cases, and that possibility is irrelevant to decision on the issues posed at this time.