**In re PETTIBONE CORPORATION, et al., Debtors.**

**Bankruptcy Nos. 86 B 01563 to 86 B 01572.**

United States Bankruptcy Court, N.D. Illinois, E.D.

Jan. 3, 1994.

---

Thomas M. Sheehan, Robert D. Kolar & Assoc., Chicago, IL, for debtors.

Edmund W. Sinnott, Paul E. Freehling, Pope Ballard Shepard & Fowle, Chicago, IL, for Allied Companies.

Paul B. O'Flaherty, Jr., Baker & McKenzie, Chicago, IL, for TWA.

Table of Contents

FINDINGS OF FACT Page
Introduction 796
The Hawxhurst Accident and Activities in the New York Court (January 1982–
January 1986) 797
Relevant Proceedings in the Bankruptcy Court (January 1986–December 1988) 798
State Court Litigation (1986–1991) 799
Lack of Notice to TWA 800
Presentation of the Present Motions 801
Pettibone's Insurance Coverage and Claims Against It 801
Applicable Terms of the Confirmed Plan and Step–Down Agreement 802
Absence of Prejudice to Pettibone 804

CONCLUSIONS OF LAW
Jurisdiction 806
The Allied Companies' Motion 806
The TWA Motion 807
Due Process Requirements of Notice 807
Bankruptcy Notice Requirements 808
Pettibone's Objections under 11 U.S.C. § 502 809
Is American Centennial Obliged to Defend? 810
Authorities Cited by Pettibone 811
Authority to Grant These Motions 814
Burden of Proof 814
Asserted Prejudice to Pettibone's Insurer Does Not Bar the Motions 815
Conclusion 815

---

*FINDINGS OF FACT AND CONCLU-
SIONS OF LAW ON MOTIONS OF
TWA AND ALLIED COMPANIES TO
FILE LATE CLAIMS*

JACK B. SCHMETTERER, Bankruptcy
Judge.

The Debtors' consolidated Plan was con-
firmed under Chapter 11 of the Bankruptcy
Code on December 9, 1988. Disputes over
claims treated under that Plan were to be
resolved by this Court following confirma-
tion. The Allied Companies and TWA
moved for leave to file their late claims after
expiration of a claims bar date set by order
prior to confirmation. Debtors (collectively
"Pettibone") objected. In the resulting con-
tested proceeding, summary judgment was
sought and denied, but undisputed facts were
found to be established for purposes of the
forthcoming evidentiary hearing. Evidence
was taken on factual issues posed, and the
parties rested. Final argument was heard
and considered, along with written Findings
and Conclusions proposed by the parties as
part of their respective arguments. Having
considered the foregoing, the Court now

makes and enters the following Findings of
Fact and Conclusions of Law. Based there-
on, both of the requested late claims may be
filed.

## FINDINGS OF FACT

### Introduction

Pettibone was and is a manufacturer of
heavy machinery and equipment. Many
users of those products claim to have been
mangled thereby, and sought redress on
product liability theories. Many of those
claimants failed to file claims in this Chapter
11 bankruptcy proceeding or to take other
steps to avoid the pitfalls of bankruptcy law.

Substantial post-confirmation litigation re-
sulted. Those disputes included motions of
Rockwell International Corporation and Al-
lied–Signal, Inc. to file late claims (allowed at
110 B.R. 837) (Jan. 23, 1990); of Rodney
Hunt to file late claims (denied at 123 B.R.
304) (Oct. 23, 1990); Adversary Complaint to
enjoin injury suit, *Pettibone v. Barbara*

*Payne* (injunction denied and late claim allowed to be filed at 151 B.R. 166) (Jan. 21, 1993). Finally, Robert Hawxhurst, whose alleged injury underlies the instant disputes, moved to file a late claim. His motion to file a late claim against estate assets was denied because his counsel disregarded repeated notices concerning the claims bar date. However, he was allowed to continue his suit against Pettibone as a basis to proceed against insurance. 156 B.R. 220, July 2, 1993 (hereafter the "Hawxhurst Order").

Findings of Fact contained in the Hawxhurst Order provide an available introduction hereto, and need not be repeated fully here. 156 B.R. 220.

### The Hawxhurst Accident, and Activities in the New York Court (January 1982–January 1986)

On January 6, 1982, Robert Hawxhurst, an employee of Trans World Airlines, Inc. ("TWA"), was allegedly injured at John F. Kennedy International Airport in New York when an electric baggage truck ("EBT") manufactured by Pettibone rolled over on him. Allied Ex. 19 (this Court's Mar. 22, 1993 Order, which found that facts stated in the Allied Companies' "Statement of Material Facts" in support of the summary judgment motion were true. Finding No. 1.)

In October of 1982, Hawxhurst registered in the Supreme Court of the State of New York, Nassau County, his personal injury complaint against New York Telephone Company ("N.Y. Telephone") and Pettibone, alleging they were responsible for his injuries. The Hawxhurst case was assigned to, and still pends before, New York State Supreme Court Justice John S. Lockman. Allied Ex. 19 at Finding No. 6. June 14, 1993 Tr. (testimony of Cook) at 41–43; June 17, 1993 Tr. (testimony of Gorfinkel) at 311–12.

Hawxhurst's employer TWA (through its insurance carrier INA) served a Notice of Lien with respect to any recoveries Hawxhurst might recover against Pettibone. However, receipt of the worker's compensation lien did not create or represent any debt owed by Pettibone to TWA or its insurance carrier. Notice of the lien claim was received by Pettibone on April 18, 1983. Tr.

Proceedings at 208 (testimony of Douglas Johnson).

In response to the Hawxhurst personal injury complaint, Pettibone retained the New York law firm, then known as Rivkin, Leff, Sherman & Radler, (the "Rivkin Firm") to represent Pettibone. The Rivkin Firm soon took a number of steps, including the following:

a. Sought from Hawxhurst a bill of particulars.

b. Engaged in investigation within Pettibone's organization. As a result of such investigation, the Rivkin Firm identified the model and serial number of the EBT involved in the incident, and placed in its files the applicable product manuals.

c. Interviewed the design engineer then employed by Pettibone.

d. Noticed and requested (but did not take) Hawxhurst's deposition. June 16, 1993 Tr. (testimony of Johnson) at 189, 256–60; June 17, 1993 Tr. (testimony of Gorfinkel) at 307, 310–13, 319, 341.

In October 1983, Hawxhurst provided a bill of particulars to N.Y. Telephone and Pettibone. Allied Ex. 26. Later in October 1983, Hawxhurst amended his complaint and added the Allied Companies as defendants. Allied Ex. 1.

On December 2, 1983, the Allied Companies served on all parties their Answer to Hawxhurst's Amended Complaint and their Cross–Complaint for indemnification and contribution against N.Y. Telephone and Pettibone. Allied Ex. 2. On January 6, 1984, the Rivkin Firm forwarded a copy of the Allied Companies' Answer and Cross–Complaint to Pettibone's counsel, together with a cover letter. Pettibone Ex. 56. On February 6, 1984, Pettibone served on all parties its Answer to Hawxhurst's Amended Complaint and its own Cross–Complaint for indemnification and contribution against N.Y. Telephone and the Allied Companies. Allied Ex. 3.

The formats of the Allied Companies' and Pettibone's Cross–Complaints against each other (Allied Exs. 2 and 3) were similar.

Neither pleading mentioned in its title that a cross-complaint was embodied within the pleading. However, no attorney who read either document could fail to see the cross-complaint contained therein. Accordingly, any suggestion that the Allied Companies' cross-complaint was unknown would be frivolous.

On January 16, 1984, N.Y. Telephone served on all parties its Answer to Hawxhurst's Amended Complaint and its Cross-Complaint against Pettibone and the Allied Companies.

■ Under New York law and practice, a cross-defendant is presumed to have denied the cross-claim allegations. It need not serve a response to the cross-complaint (unless the cross-claimant demands a response, which no cross-claimant did in the Hawxhurst case). Accordingly, although Pettibone did not respond to the Allied Companies' Cross–Complaint in the Hawxhurst case, no inference can be drawn that Pettibone was unaware it had been named as a cross-defendant. Indeed, it is clear that Pettibone acquired actual knowledge of the Allied Companies' cross-complaint at the time its attorneys were served with a copy of it.

The evidence did not demonstrate material activity in the state court litigation during the two years before Pettibone filed its bankruptcy petition in 1986.

### Relevant Proceedings in the Bankruptcy Court (January 1986—December 1988)

On January 31, 1986, Pettibone filed under Chapter 11 of the Bankruptcy Code. Allied Ex. 19 at Finding No. 7. By letter dated February 24, 1986, M. Paul Gorfinkel, an attorney at the Rivkin Firm, forwarded to Mendes & Mount, attorneys for the Allied Companies in the Hawxhurst case, a cover letter and a copy of "Certificate of Retention of Debtor in Possession", dated February 3, 1986. Allied Exhibit 4. Thus, as of late February 1986, the Allied Companies acquired actual notice that Pettibone had petitioned under Chapter 11 for bankruptcy protection.

In August 1986, this Court entered an order setting October 31, 1986 as the claims bar date, i.e., the last day by which creditors were required to file proofs of claim. Copies of this order were to be mailed to Pettibone's known creditors, including Hawxhurst. Pettibone Exs. 5, 6, and 7. However, the Allied Companies were not listed on the service list, and in fact no copy was sent to them. June 16, 1993 Tr. (testimony of Johnson) at 196–98. Although Pettibone's New York personal injury counsel knew of the Allied Companies' cross-claim in 1983, its bankruptcy counsel in Chicago did not seem to have knowledge of the cross-claim in 1986. Thus, the Allied Companies were neither scheduled as creditors nor placed on the notice list.

■ Pettibone caused notice of the bankruptcy claims bar date to be published in newspapers of general circulation. June 16, 1993 Tr. (testimony of Johnson) at 196. By this act, unknown creditors were to be given at least constructive notice of the bar date. However, the Allied Companies were known creditors, entitled to actual notice. Accordingly, publication is not found or deemed to be constructive notice to the Allied Companies. The evidence did not show that the Allied Companies or their counsel actually read the publication. They did not learn of the bar date, and therefore did not file proofs of claim in Pettibone's bankruptcy proceeding prior to the October 31, 1986 claims bar date. Allied Ex. 19 at Finding No. 10.

In November of 1987, Pettibone's Official Unsecured Creditors' Committee (the "Committee") moved for disallowance of all personal injury claims for which no proof of claim had been filed. Notice of the motion was served on many affected creditors, but not on TWA or the Allied Companies. Hawxhurst's claim was one of the many claims to which this motion applied. Many claimants who had individually or through counsel received notice of the claim bar date disregarded it. Remarkably, about one-quarter of all counsel to personal injury claimants who received notice of the claims bar date chose to disregard the notice. However, counsel for TWA and the Allied Companies cannot be charged with that same disregard because no copy of the motion to

disallow claims was provided to them until late February 1991. June 16, 1993 Tr. (testimony of Johnson) at 196–98, 202–03; Allied Ex. 19 at Finding No. 17.

On March 11, 1988, the Committee's motion was granted, and an order was entered ("the March 11 Order") to the effect that certain identified personal injury claims were deemed disallowed. Hawxhurst's claim was thereby disallowed. The March 11 Order did not mention the Allied Companies or N.Y. Telephone. Allied Ex. 8. Copies of the order were to be mailed to Pettibone's affected creditors, but again no copy was provided to the Allied Companies until late February 1991. Allied Ex. 19 at Finding No. 11.

This Court confirmed Pettibone's Second Amended Plan of Reorganization by an order entered December 9, 1988. Pettibone Exhibits 2 (the Plan) and 3 (the Order). TWA and the Allied Companies were not on the notice list, so they were not served with any notices or papers leading up to confirmation, and did not participate in the confirmation hearing.

### State Court Litigation (1986–1991)

The Hawxhurst personal injury case languished in New York from early 1986 through late 1990. No discovery was initiated during that period. Although the continuation of Hawxhurst's claims against Pettibone was at least questionable following the March 11 Order, Pettibone sought no relief or dismissal from the case in state court based on the March 11 Order. During that period, the state court was not asked to take any action resulting from the March 11, 1988 order. Allied Ex. 19 at Finding No. 13.

On or about November 20, 1990, as a predicate to filing a motion to dismiss the Hawxhurst case for want of prosecution, the Allied Companies served on Hawxhurst a demand that he serve and file a Note of Issue within 90 days. Under New York practice, a Note of Issue is required to place a suit on the court's trial calendar. June 14, 1993 Tr. (testimony of Cook) at 40; June 17, 1993 Tr. (testimony of Gorfinkel) at 323–24; Allied Ex. 19 at Finding No. 14. The Allied Companies' demand is Allied Exhibit 7.

On or about January 25, 1991, Hawxhurst served on counsel for the Allied Companies notice that he had retained new counsel. Allied Ex. 19 at Finding No. 15.

By stipulation dated February 14, 1991, Hawxhurst and the Allied Companies agreed to extend the time for Hawxhurst to serve and file his Note of Issue to May 31, 1991. Allied Ex. 19 at Finding No. 16.

Just prior to February 26, 1991, a legal assistant at the Rivkin Firm, telephoned Kevin F. Cook, an attorney at Mendes & Mount, and requested discontinuance of the Allied Companies' Cross–Claim against Pettibone. Mr. Cook asked her to put her request, and the reasons for it, in writing. By letter dated February 26, 1991, she sent Mr. Cook a request for discontinuance and a copy of the March 11 Order. This was the first notice the Allied Companies received that this Court had set a claims bar date, that such bar date had passed, and that claims of Hawxhurst and others were barred. June 14, 1993 Tr. (testimony of Cook) at 48–50; Allied Ex. 19 at Finding No. 17. Ms. Eisen's February 26, 1991 letter and enclosures is Allied Exhibit 8.

When Mr. Cook received the February 26, 1991 letter, the status of the Hawxhurst case was:

a. The Amended Complaint and cross-complaints described above were filed and pending;

b. For more than five years, there had been no court appearances, and very little discovery; and

c. Hawxhurst had about 90 days remaining to serve and file his Note of Issue, failing which his case would be subject to dismissal by the state court for want of prosecution. Allied Ex. 19 at Finding No. 18.

In late March or early April 1991, Hawxhurst agreed to be deposed, and indicated through his counsel that he was prepared to resume prosecution of his case. Mr. Cook notified all other counsel in the Hawxhurst case of the date, time, and place for Hawxhurst's deposition. Allied Ex. 27.

No attorney for Pettibone was present at the Hawxhurst deposition on April 30, 1991.

Hawxhurst's attorney, Kenneth Ready, indicated on the record at the deposition that he had telephoned Pettibone's counsel twice on the day before to remind counsel of the deposition. June 18, 1993 Tr. (testimony of Cook) at 409, 413.

After the Hawxhurst deposition, the Allied Companies withdrew their demand that he file a Note of Issue by May 31, 1991. The parties then agreed that court-supervised discovery was essential and requested a discovery conference. Allied Ex. 19 at Finding No. 19.

At the July 26, 1991 discovery conference, counsel for the Allied Companies first learned that Hawxhurst's counsel had a copy of TWA's report investigating the incident in which Hawxhurst was injured. Allied Ex. 19 at Finding No. 20. A copy of the report, which was supplied to counsel for the Allied Companies at that time, is Allied Exhibit 9.

Within a week of receiving the TWA report, the Allied Companies served a third-party complaint on TWA, asserting that Hawxhurst's injuries were caused by TWA's negligence. On September 9, 1991, TWA served its Answer to the third-party Complaint and its Cross–Complaint against Pettibone, N.Y. Telephone, and the Allied Companies. Allied Ex. 19 at Finding Nos. 21 and 22; and Allied Ex. 22. TWA's Cross–Claim seeks damages from Pettibone under theories of contribution and indemnification.

On September 10, 1991, Justice Lockman directed all parties in the Hawxhurst case to appear for a further preliminary conference on September 27, 1991. On September 17, 1991, Mr. Gorfinkel of the Rivkin Firm forwarded to Justice Lockman a copy of the March 11 Order. He also expressed his opinion that the Hawxhurst litigation should be dismissed with prejudice as against Pettibone. He also stated that a demand seeking the discontinuance of all claims and cross-claims against Pettibone had been sent to all other counsel. Allied Ex. 19 at Finding No. 23; Allied Ex. 11.

On September 19, 1991, Pettibone served its Answer to TWA's Cross–Complaint, for the first time asserting an affirmative defense based upon the Order of March 11, 1988. Allied Ex. 19 at Finding No. 24; Allied Ex. 23. The same day, Mr. Gorfinkel forwarded a letter to all other counsel in the Hawxhurst case, stating that all claims and cross-claims against Pettibone should be dismissed. He indicated his intent to seek an order of contempt from the bankruptcy court if dismissals were not forthcoming. However, no claim or cross-claim has been dismissed, nor did Pettibone seek an order of contempt or stay order against any Hawxhurst case claimant or cross-claimant. June 17, 1993 Tr. (testimony of Gorfinkel) at 317, 340, 347–48.

On September 27, 1991, counsel for Hawxhurst, N.Y. Telephone, the Allied Companies, and TWA appeared in Justice Lockman's chambers for another discovery conference. During the conference that court granted the request of the Allied Companies and TWA to suspend the personal injury proceedings informally, in order to permit the Allied Companies and TWA to file an application with this Court for leave to file late proofs of claim and to lift the automatic stay. Allied Ex. 19 at Finding No. 25.

### Lack of Notice to TWA

The third-party action brought by the Allied Companies against TWA was filed approximately nine and one-half years after the accident, eight years after the original Hawxhurst action was originally commenced. TWA was not served notice of the claims bar date in this matter, or notice of the motion by the unsecured creditors committee to disallow claims against Pettibone. TWA did not receive any notice concerning these bankruptcy proceedings until service of the Debtor's Answer to TWA's Cross–Complaint in the state court action on September 19, 1991.

The motion of the unsecured creditors committee to disallow claims in the Pettibone bankruptcy was determined years before TWA was impleaded into Hawxhurst's personal injury litigation. Until TWA was impleaded, it was not informed that any party asserted TWA was a potential creditor of Pettibone, and it had no basis upon which file a claim relating to the Hawxhurst case. Pettibone now suggests that the workers' compensation lien created some form of interest

in the Hawxhurst litigation on the part of TWA or its workers' compensation insurance carrier. But at the time Pettibone did not regard TWA as a creditor in its bankruptcy proceeding, even after receiving the notice of lien from TWA's insurer. Tr. (testimony of Douglas Johnson) at 269. That notice was in the Rivkin firm's litigation file for the Hawxhurst case when Pettibone conducted its claims review for purpose of scheduling creditors to be noticed in its bankruptcy case, but TWA was not put on the notice list.

■ No debt arose by virtue of the lien notice.[1] Nor is it part of New York civil practice for such lien holders to intervene and participate in personal injury litigation. Tr. (testimony of Kevin Cook) at 57. Therefore, TWA's workers' compensation insurance carrier was not a party to the Hawxhurst litigation in New York.

### Presentation of the Present Motions

On November 1, 1991, counsel for the Allied Companies filed its pending motion. Allied Ex. 19 at Finding No. 27, Allied Ex. 13. That of TWA was filed on January 9, 1992. Allied Ex. 19 at Finding No. 34. Pettibone's defense of these motions is through counsel funded by their insurance carrier, American Centennial Insurance Co. ("American Centennial"). Allied Ex. 14.

Thus, it was about nine months after the Allied Companies and TWA learned that the claims bar date expired in October of 1986, that they sought leave to file their late claims. There is no evidence that Pettibone was prejudiced by the passage of those nine months. Moreover, good reasons existed for that delay. In March 1991, the Hawxhurst case appeared on the verge of dismissal for want of prosecution. If the case had been dismissed, the cross-claims would also have been dismissed, obviating any need for filing claims here. Even after the Hawxhurst deposition was taken in late April 1991, the status of his case was uncertain for several months. It was not until mid-September 1991 that Pettibone asserted the March 11 Order as a defense to the personal injury action. Soon afterwards, the Allied Companies and TWA began their efforts here for leave to file late proofs of claim.

On January 29, 1992, Pettibone filed its objection to the motions of the Allied Companies and TWA. No other party-in-interest to Pettibone's bankruptcy proceeding has opposed these motions. Allied Ex. 19 at Finding No. 35.

In early February 1992, TWA filed its own petition for bankruptcy relief under Chapter 11 in the federal court in Wilmington, Delaware. Allied Ex. 19 at Finding No. 37.

For almost a year thereafter, all matters before this Court were held in abeyance at the request of the Allied Companies, TWA, and Pettibone, who repeatedly and persuasively represented that an overall settlement was imminent. This hope did not bear fruit.

In early 1993, the Allied Companies moved here for summary judgment. The motion was supported with a Local District Rule 12(m) statement of material facts as to which the Allied Companies contended there was no genuine issue. Pettibone opposed the motion but did not object to the Allied Companies' Local District Rule 12(m) statement of uncontested facts. On March 22, 1993, the motion for summary judgment was denied. For purposes of trial, the facts stated in the Allied Companies' Local Rule 12(m) statement were found to be established under Fed.R.Civ.P. 56(d). However, Pettibone was permitted to offer other evidence at trial to explain the significance of facts so established. Allied Ex. 19.

### Pettibone's Insurance Coverage and Claims Against It

Prior to entering bankruptcy, Pettibone carried insurance to protect itself against product liability claims. It carried separate layers of insurance, with a deductible known as a self-insured retention ("SIR"). June 16, 1993 Tr. (testimony of Kolar) at 204–05. Pettibone's insurance policy year relevant to

---

1. Under workman's compensation laws of New York, including Chapter 684, § 29, neither TWA's payment of workman's compensation benefits to Hawxhurst nor its notice of lien to Petti- bone with respect to those payments created a relation of debtor and creditor between Pettibone and TWA.

Hawxhurst's claim ran from October 22, 1981 to October 22, 1982. For that year, the first insurance layer over the SIR was obtained from Northumberland General Insurance Company ("Northumberland"). The next $5 million in liability beyond Northumberland coverage was covered by American Centennial. Additional layers of coverage were obtained from other insurers. June 16, 1993 Tr. (testimony of Kolar) at 204–06; Allied Ex. 19 at Finding No. 31.

In July 1985, Northumberland was placed into insolvency proceedings. Its estate was unable to satisfy Northumberland's remaining obligations under the Pettibone policies. Northumberland's coverage included an obligation to defend Pettibone in personal injury suits. Following Northumberland's insolvency, Pettibone's excess insurers, including American Centennial, argued that they had no duty to defend. Allied Ex. 19 at Finding No. 31.

In the course of Pettibone's reorganization effort, on May 12, 1987, American Centennial and the other excess carriers agreed to step down and defend personal injury cases filed against Pettibone, and to pay claims up to the carriers' policy limits, under several conditions. One condition is that Pettibone must exhaust its SIR before the excess insurers are required to pay on any claims. Another condition is that defense costs incurred by the excess insurer are credited against policy coverage. A third condition is that the excess insurer has the right to decide the manner of defense and whether to settle claims. Further, Pettibone is charged with cooperating fully with the insurers. Pettibone Ex. 4.

The step-down agreement was incorporated into Pettibone's confirmed Plan of Reorganization. Under the Plan, the burden of unused SIR for each policy year is in effect shared pro rata among recovering claimants through deductions from their settlements or judgments. Pettibone Exs. 2 and 3. Those creditors in turn have rights as Class 4 claimants to share in a fund established by debtor and contributed to periodically.

For the 1981–82 policy year, the insurance company with liability for personal injury suits is American Centennial. It is the carrier on a policy of insurance for $5 million

ultimate net loss. This means that American Centennial's liability is limited to $5 million, including its defense costs. June 16, 1993 Tr. (testimony of Johnson) at 225–26; June 17, 1993 Tr. (testimony of Kolar) at 356, 374–75.

When Pettibone filed for bankruptcy, its unused SIR for the 1981–82 policy year was $773,835.32. Pettibone Ex. 2 at Sched. II, p. 2; June 16, 1993 Tr. (testimony of Johnson) at 224. Schedule III of the continued confirmed Plan (Pettibone Exhibit 2) lists 18 filed proofs of injury claims for that year, totalling $20.9 million. Accordingly, American Centennial had a powerful incentive to enter into the step-down agreement so as to defend the claims which threatened its policy limit, regardless of whether potential but as yet unfiled claims were subject to disallowance.

In Pettibone's 1981–82 insurance policy year, no claims have yet been tried to verdict, but eight have been settled. The settlement amounts aggregate $1,061,500. An additional five claims have not yet been resolved by settlement or verdict. Joint Exhibit 1. Thus, the settlement amounts already agreed to with respect to the 1981–82 policy year exceed Pettibone's SIR. American Centennial will be obliged to pay something for this policy year. It remains to be seen how much that will be when all claims are liquidated.

Unless otherwise adjudicated, allowance of the present motions means that American Centennial will be obligated by the step-down agreement to provide both defense costs and indemnification up to the extent of its policy limits.

### Applicable Terms of the Confirmed Plan and Step–Down Agreement

■ The step-down agreement between Pettibone and American Centennial was executed on May 12, 1987, prior to filing of the November 1987 motion of the Unsecured Creditors Committee to disallow unfiled claims, and prior to allowance of that motion on March 11, 1988.

At the time it entered into the step-down agreement, American Centennial could not

have known whether or not additional claims falling within the 1981–82 policy year would be filed with leave of court. Indeed, its agreement expressly recognized the possibility of the allowance of future filed claims, as did the confirmed Plan.

Moreover, Pettibone's Plan allowed for filing of late claims, if the Court permitted. No provision of that Plan precluded such filings. The Plan provides that this Court is to hear and determine any objections to claims filed both before and after confirmation. The Court may "without limitation" hear and determine objections to any claim or interest and "allow or disallow any disputed claim in whole or in part." Pettibone Ex. 2, Plan § 9.08. Late claims such as TWA's come within the Plan's definition of "claim" and "disputed claim." A claim thereunder includes rights to payment whether liquidated or unliquidated and whether fixed or contingent. Plan § 1.13. A "disputed claim" is defined as a claim which was filed or "deemed filed" with the Bankruptcy Court, to which an objection was filed by a "later date" to be determined by the Court. Plan § 1.32.

Plan § 7.01(b) specifies that this Court has jurisdiction over all claims under the product liability ("PL") Insurance Agreements and all claims with respect to the proceeds and amounts payable under such agreements. Section 7.05 governs "Determination of PL Claims". Plainly, like other provisions of the Plan, § 7.05 is prospective in operation.

Pettibone's step-down agreement with American Centennial, incorporated in the Plan as an exhibit, also expressly provides for filing of late claims: "[w]hereas there have been filed or otherwise asserted or may be filed or otherwise asserted products and general liability lawsuits and claims (collectively 'Claims') by certain known and unknown parties ('Claimants') against Pettibone ..." Pettibone Ex. 4, p. 2. Providing for PL claims which "may be filed or otherwise asserted," the step-down agreement was clearly not limited to claims known and scheduled at the time of its execution. Nor is that agreement limited by the definition of "PL Claim" appearing in § 1.53 of the Plan (Pettibone Ex. 2), which has language limit-ing claims to those listed in Schedule III of the Plan. Section 1.55 of the Plan further provided that, "in the event of any conflict or inconsistency between any provision of an Exhibit and any provision of the Plan, the provision of the Exhibit shall be controlling." Pettibone Ex. 2, pp. 5–6. Paragraph 1.55(x)–(y) expressly states:

> (x) In the event that any conflict of inconsistency between any portion of an Exhibit [such as the American Centennial insuring agreement] and any provision of the Plan, the provisions of the Exhibit shall be controlling, (y) The definition of any term in the Plan shall not apply to any Exhibit. . . .

The step-down agreement was just such an exhibit. That agreement and its language contemplating PL claims which "may be filed or otherwise asserted" demonstrate that the insurer accepted the possibility of the very circumstance presented here.

This Court's order confirming Pettibone's Plan of reorganization also expressly contemplated late claims by providing that it would not violate the post-confirmation injunction under 11 U.S.C. § 524 for claimants to prosecute "PL claims as authorized to be filed in the case by order of the court." Pettibone Ex. 3, ¶ 4, pp. 10–11. Thus, the confirmation order reserved authority to allow for claims "to be filed" after that order was entered.

Fed.R.Bankr.P. 2002 mandates the giving of advance notice to creditors of the time fixed for filing proofs of claim pursuant to Rule 3003(c). Rule 3003(c)(3) authorizes establishment and extension of a bar date for filing claims. It provides that "the court shall fix and for a cause shown may extend the time within which proofs of claim ... may be filed."

Federal Rule of Bankruptcy Procedure 9006(b)(1) provides that "the court for cause shown may *at any time* in its discretion ... (2) on motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect." (Emphasis added.) If Pettibone's Plan was to exclude or limit court powers to entertain late claims under Rule 9006(b)(1), any such exclusion or limitation in

the Plan would have been express. No such express exclusion or limitation of that authority appears anywhere in the Plan or related disclosure statements or confirmation order. On the contrary, consistent with Rule 9006(b)(1), the Plan and related documents expressly referred to the possibility of assertion and allowance of additional claims.

In recognition of the foregoing provisions, Pettibone's current proposed conclusions of law concede that "the Plan does include language with regard to additional claims being authorized to be filed in the case by order of the Court...." But it argues that such language applies only to claims filed prior to confirmation. Otherwise, "there could never be any finality to this reorganization".

This Court's order confirming the Plan of reorganization, an order drafted and prepared by Pettibone's counsel, belies any intent either that allowed claims were limited to those listed on Schedule III, or were limited to those filed before confirmation. Paragraph 4 of that confirmation order provided for modification of the automatic stay for PL claimants to prosecute their PL claims "as identified on Schedule III of the Plan, *or as authorized to be filed in the case by Order of the Court.*" Pettibone Ex. 3, pp. 10–11 (emphasis supplied). Neither at the time it executed its step-down agreement before finalization of the reorganization Plan, nor at the time of the Plan's confirmation, could American Centennial have held any reasonable expectation that its PL claims exposure was necessarily limited to those claimants appearing on Schedule III or filing pre-confirmation. Moreover, the thrust of the Plan's treatment of disputed claims was to deal with all of them after confirmation. Neither the Plan nor Disclosure Statement by their terms barred the possibility of claim filings after confirmation. If Pettibone intended such draconian provisions cutting rights of parties who had no notice of the claims bar date, they would have been inserted expressly in the insurer's step-down agreement, or in the Plan, or in the confirmation order, or in all of those documents. That restriction, which nowhere appears in those documents, cannot be read into them now.

Pettibone's also urges that the insurer's assent to defend additional PL claims is necessary on a case-by-case basis. Pettibone underscores language in Section D of the Second Amended Disclosure Statement to the effect that, "upon a finding by the Bankruptcy Court that the insurance company has agreed to defend a PL claim ... such PL claimant may proceed with his lawsuit...." But the Disclosure Statement went on to report that "the first solvent layer insurers [including American Centennial] have already agreed to do so." The step-down agreement comprised such consent, and this order comprises the necessary finding by the Bankruptcy Court.

It is evident that permitting TWA and the Allied Companies to file late claims would neither deprive American Centennial of the benefit of its bargain nor violate any aspect of the debtor's Plan.

### *Absence of Prejudice to Pettibone*

■ One factor the Court considers when deciding whether to allow late claims is whether prejudice will result if such a claim is allowed. Pettibone has not made a showing that it will be materially prejudiced if the Allied Companies and TWA are allowed to file their claims.

■ Pettibone's argument that allowing the late claim jeopardizes its reorganized business is without merit. First, the "fresh start" concept does not apply to corporate debtors. *In re Prudential Lines, Inc.*, 928 F.2d 565, 573 (2d Cir.1991), (citations omitted), *cert. denied,* —— U.S. ——, 112 S.Ct. 82, 116 L.Ed.2d 55 (1991). Moreover, the evidence here did not establish that Pettibone would suffer harm of major or measurable scope.

■ Pettibone is defended by insurance funded counsel in the state court case as well as before this Court. However, Pettibone witnesses testified that the reorganized debtor will be harmed indirectly should the Allied Companies and TWA be allowed to proceed with their cross-claims. In particular, a Pettibone officer testified that if claims are allowed to continue the company's future insurance premiums may rise. He also testi-

fied that employee time will be required in order to cooperate with Pettibone counsel defending the claims in state court. June 16, 1993 Tr. (testimony of Johnson) at 237–43. These assertions are at best vague and speculative. There was no persuasive or precise evidence from which this Court could quantify and ascertain the supposed impact on future insurance premiums or the burden on employee time.

Pettibone is now a feisty, stable, publicly-held manufacturer and active participant in the competitive commercial world. The evidence did not show that rising insurance premiums would force Pettibone back into bankruptcy, materially affect its solvency, or adversely impact at all on consummation of its confirmed Plan (which appears to be fully consummated except for the continuing claims litigation). Indeed, it was not even shown that a future increase in premiums would comprise a significant increase in Pettibone's cost of doing business. Moreover, the evidence did not establish that any premium increase would materially differ from the usual impact that other injury claims will have on its premiums for liability insurance under normal business conditions. Nor did Pettibone establish that the impact on employee time for helping defend the Allied Companies and TWA claims would differ from the burden on any company of its size to aid in defense of insured claims.

Apart from the lack of precision or corroboration in Pettibone's evidence, there is another reason to doubt that allowance of the requested late filings will significantly affect its future insurance premiums. The EBT is a discontinued product line, no longer manufactured by reorganized Pettibone. Pettibone's cost of future insurance against product liability claims for other products will most likely be established principally by its insurers' calculation of their exposures from current product lines, although the evidence did not permit such calculation to be quantified or apportioned between current and former products.

To the extent this issue is relied on, Pettibone had the burden to prove that the indirect costs referred to here would be material. The only evidence given was broad-brush, general testimony offered by a Pettibone officer. No insurance representative, actuary, or other expert testified to the certainty or extent of impact. Pettibone has not met its burden of persuasion on this point.

■ Moreover, Pettibone has suffered no material prejudice to its ability to defend the Hawxhurst personal injury litigation. That litigation was pending for over two years, from October 1983 through January 1986, before Pettibone's bankruptcy filing. Before that filing, defense counsel for Pettibone gathered engineering documentation concerning the type of EBT involved in the Hawxhurst accident, and conducted an inspection of the specific EBT involved. Pettibone has not established that any specific, critical evidence available in the early stages of the Hawxhurst litigation is no longer available.

■ During that two year period preceding Pettibone's bankruptcy, its counsel in the Hawxhurst personal injury litigation had full opportunity to conduct any discovery or investigation consistent with New York procedure. Even if *arguendo* prejudice to Pettibone had been shown to arise from delay in the Hawxhurst personal injury litigation, it would have derived from the leisurely pace at which all parties, including Pettibone, prosecuted and defended that litigation.

TWA was not added as a party to the Hawxhurst New York personal injury litigation until 1991. Therefore, any alleged prejudice to Pettibone from delay in those proceedings can hardly be attributed to inaction or dilatory conduct on the part of TWA. Likewise, the Allied Companies' failure to file a timely claim is due directly to the failure of Pettibone to notify the Allied Companies' counsel of the claims bar date, even though the Allied Companies was a known creditor.

■ Pettibone is hardly in a position to complain of any prejudice caused by delay of the present claimants in coming to this Court, but in any event it has not been prejudiced by that delay. Any impact which the allowance of these claims for contribution and indemnity would have on American Centennial, in the form of defense costs or the payment of settlements or judgments, does

not constitute prejudice to reorganized Pettibone.

Facts stated in the Conclusions of Law will stand as additional Findings of Fact. Any legal conclusions stated in the Findings of Fact will stand as additional Conclusions of Law.

## CONCLUSIONS OF LAW

### Jurisdiction

This matter is before the Court pursuant to 28 U.S.C. § 157, and is referred under Local District Court Rule 2.33. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b). The resolution of these matters affects allowance of claims and enforcement of Plan issues reserved to this Court. Accordingly, they are core proceedings under 28 U.S.C. § 157(b)(2)(A) and (B). See Diamond Mortgage Corp. of Ill. v. Sugar, 913 F.2d 1233, 1239 (7th Cir.1990), cert. denied, 498 U.S. 1089, 111 S.Ct. 968, 112 L.Ed.2d 1054 (1991).

### The Allied Companies' Motion

■ The Allied Companies were known creditors of Pettibone at the time its Chapter 11 petition was filed. However, those creditors did not receive notice and had no knowledge of the claims bar date until several years after that date had passed. A Chapter 11 debtor violates a known creditor's due process rights under the Fifth Amendment to the United States Constitution by failing to give timely notice of the claims bar date. See Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950); In re Spring Valley Farms, Inc., 863 F.2d 832, 835 (11th Cir.1989); Sheftelman v. Standard Metals Corp., 839 F.2d 1383, 1386 (10th Cir.1987), cert. dismissed, 488 U.S. 881, 109 S.Ct. 201, 102 L.Ed.2d 171 (1988).

■ The Allied Companies seek to be / included as Class 3 and 4 claimants. To be included as a Class 3 (Product Liability) claimant against the available insurance proceeds, the Allied Companies were not required to file proofs of claim at all, although the injunction contained in the confirmation order bars any action against Pettibone until

they are relieved from it. See the Hawxhurst Order, 156 B.R. 220, relying on Matter of Hendrix, 986 F.2d 195, 196–97 (7th Cir. 1993); Matter of Shondel, 950 F.2d 1301, 1306–07 (7th Cir.1991); and In re Fernstrom Storage & Van Co., 938 F.2d 731, 734 (7th Cir.1991).

■ The Allied Companies also seek to be included as Class 4 (general unsecured creditors), which does require the filing of proofs of claim.

■ Unlike Hawxhurst, the Allied Companies received no notice of the bar date until years after it had passed. The Allied Companies delayed relatively few months after learning of the bar date before filing their motion here. Bankruptcy courts may allow claims to be filed after the bar date. The relevant factors to be considered when determining whether to permit a late claim to be filed are (i) the reason for the delay; (ii) the length of the delay; (iii) whether the debtor was prejudiced by the delay; (iv) the debtor's knowledge of the claim; and (v) the good faith of the creditor. Pioneer Investment Services Co. v. Brunswick Associates, L.P., ── U.S. ──, ──, 113 S.Ct. 1489, 1498, 123 L.Ed.2d 74 (1993). See also In re Pettibone Corp. and earlier authorities collected at 123 B.R. 304, 308 (Bankr.N.D.Ill.1990). Under the facts earlier described, all of those factors militate in favor of allowing the Allied Companies to file.

There was no showing of any prejudice to Pettibone from the short delay after the Allied Companies learned the relevant facts. No prejudice will result if the Allied Companies are allowed to file their late proofs of claim and to share in the distribution of Pettibone's SIR and any distribution from the Class 4 pool.

If the Allied Companies are not allowed to file late proofs of claim, they will be seriously prejudiced. They would not be entitled to share in the SIR burden with other creditors or share in assets available to Class 4 creditors. Unless relieved of the injunctive effect of the confirmation order, they will not be able to pursue available insurance proceeds as allowed by Hendrix, Shondel, and Fernstrom.

■ The Allied Companies' failure to file timely proofs of claim was the result of both excusable neglect within the reasoning of *Pioneer Investment Services,* —— U.S. at ——, 113 S.Ct. at 1498 and lack of notice from Pettibone. The Allied Companies were known creditors who were entitled to timely notice of the claims bar date. Because of Pettibone's dereliction, the Allied Companies were unaware of the bar date until long after it had passed.

Other unsecured, personal injury creditors of Pettibone from the same policy year may incur a small adverse impact from allowing the Allied Companies to participate in the distribution of Pettibone's SIR. Unsecured creditors who filed timely proofs of claim may receive slightly less from the Class 4 pool by reason of inclusion of TWA and the Allied Companies among the participants. However, their representatives were on notice of the present motions for leave to file late proofs of claim, but did not oppose them or assert that such creditors' interests would be prejudiced. Perhaps that is because they may benefit from these claims if judgments result.[2]

On balance, the equities overwhelmingly favor allowance of the late filing of the Allied Companies' motion.

### The TWA Motion

■ Denial of TWA's claim would likewise prejudice it.

TWA seeks leave to file a claim against Pettibone, as it may be contingently liable to the Allied Companies who, in turn, may be liable to plaintiff Hawxhurst. TWA's claim is for reimbursement in the event that TWA and Pettibone are held to be jointly and severally liable in the state court action and are required to satisfy a portion of any judgment recovered by Hawxhurst.

Should TWA be prohibited from litigating its Cross–Complaint against Pettibone, its ability to properly defend the underlying personal injury action would be severely prejudiced. The Hawxhurst suit sounds in a claim of strict product liability. Should TWA be prohibited from proving at trial that Pettibone is liable for the accident due to its negligent design and/or manufacture of the subject tractor, TWA could be obligated to pay significant monetary damages, not for negligent acts of TWA, but rather for negligent acts of Pettibone. Should it not be relieved of the confirmation order injunction, it cannot pursue available insurance proceeds to adjust the burden of any liability.

As earlier discussed, the Supreme Court recently ruled in *Pioneer* that Fed. R.Bankr.P. 9006(b)(1) applies when considering whether to allow late filed claims. *Pioneer* established a standard of "excusable neglect" as the threshold for permitting late claims to be filed. TWA's delay in seeking leave to file its claim was not the result of any neglect whatsoever. Prior to its joinder in the *Hawxhurst* personal injury case, TWA's potential right of contribution from Pettibone was incapable of prediction or assertion. After its joinder in the *Hawxhurst* personal injury litigation, TWA moved to file its late claim in this Court. These facts suggest no neglect on TWA's part, but instead a compelling set of equitable circumstances for permitting its late claim.

### Due Process Requirements of Notice

■ TWA and the Allied Companies properly rely on the principle that an elemental component of constitutional due process, as well as elemental fairness, is the

2. Such is demonstrated by the following scenario: Right now recoveries top the SIR by about $250,000.00. Every additional successful claimant increases the total insurance available pro rata dollar for dollar. A $1 million recovery will result in a total of $1,250,000.00 in insurance payments.

Assume eight claimants were to divide the $250,000.00 based on their overall recoveries totalling $1 million. Each would recover from the $250,000.00 pro rata to their settlement or judgment, averaging $31,250.00 for each.

But if a ninth claimant receives a $1 million judgment, the $1,250,000.00 over SIR would be divided as follows: Half of the $1,250,000.00 or $625,000.00 would go to the $1 million judgment creditor, the other $625,000.00 divided pro rata among the other eight claimants, averaging $78,-125.00 for each. Obviously injury claimants stand to benefit greatly from the success of other claimants.

right to receive reasonable notice. *See Pettibone v. Payne*, 151 B.R. 166 (Bankr.N.D.Ill., 1993), and authorities cited; *Chicago Cable Communications v. Chicago Cable Commission*, 879 F.2d 1540, 1545 (7th Cir.1989), *cert. denied*, 493 U.S. 1044, 110 S.Ct. 839, 107 L.Ed.2d 835 (1990); *Cosby v. Ward*, 843 F.2d 967, 982 (7th Cir.1988). A confirmation order cannot act to discharge and enjoin a claim unless the claimant has received adequate notice of the bankruptcy proceeding and of any claims bar dates fixed therein. *See In re Longardner and Associates, Inc.*, 855 F.2d 455, 465 (7th Cir.1988), *cert. denied*, 489 U.S. 1015, 109 S.Ct. 1130, 103 L.Ed.2d 191 (1989), *citing Mullane v. Central Hanover Bank and Trust Co.*, 339 U.S. 306, 313–14, 70 S.Ct. 652, 656–57, 94 L.Ed. 865 (1950); *New York v. New York, N.H. and H.R.*, 344 U.S. 293, 297, 73 S.Ct. 299, 301, 97 L.Ed. 333 (1953). The discharge of a claim without reasonable notice of the confirmation hearing is violative of the Fifth Amendment of the United States Constitution. *Reliable Electric Co., v. Olson Construction Co.*, 726 F.2d 620, 623 (10th Cir.1984).

TWA's claim was not discharged by the confirmation order because it never received any notice of Pettibone's bankruptcy, the bankruptcy's relevance to it, any bar date, the motions to disallow claims, or the confirmation hearing. *See In re Longardner and Associates, Inc.*, 855 F.2d at 465 (7th Cir.1988); *In re Pettibone, et al.*, 151 B.R. 166 (Bankr.N.D.Ill., 1993). By the same reasoning, the Allied Companies' claim was not barred by a proceeding that gave them no notice of the bar date or confirmation process.

### Bankruptcy Notice Requirements

Pettibone's publication notice is of no significance in these circumstances. The Bankruptcy Code does not require a party like TWA with no known interest in a bankruptcy proceeding to monitor national financial papers and to read notices about businesses against which they have no known claims to guard against the possibility they might later be held on notice of claim bar dates affecting claims that surface in the future.

TWA's first notice of the bar date or this Court's Order of March 11, 1988 was the same as first notice to the Allied Companies, receipt of that Order on September 20, 1991. TWA was not involved in any way with the debtor corporation at the time of notice publication, nor was it a party to the underlying personal injury action at the time. The publication of notice was insufficient provision of due process to comprise a notice to TWA of the claims bar date herein.

Although the Allied Companies had filed a cross-claim and were a known claimant, they were not given any notice of the claims bar date until years after that date expired. Reasonable notice must be provided to known party litigants in order to ensure that they are provided with the ability and opportunity to properly prosecute or defend a claim. Publication notice cannot replace actual notice due a known creditor.

It is well established that a creditor's claim can be barred for untimeliness only upon showing that the creditor received reasonable notice. *New York v. N.H. and H.R. Railroad*, 344 U.S. 293, 297, 73 S.Ct. 299, 301, 97 L.Ed. 333 (1953); *Mullane*, 339 U.S. at 314, 70 S.Ct. at 657. "Reasonable notice" is defined by the Supreme Court as "notice reasonably calculated under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*, 339 U.S. at 314, 70 S.Ct. at 657; *Peralta v. Heights Medical Center*, 485 U.S. 80, 85, 108 S.Ct. 896, 899, 99 L.Ed.2d 75 (1988); *Greene v. Lindsey*, 456 U.S. 444, 449–50, 102 S.Ct. 1874, 1877–78, 72 L.Ed.2d 249 (1982).

The totality of circumstances must be considered in determining whether notice was reasonable. *People ex rel. Hartigan v. Peters*, 871 F.2d 1336, 1340 (7th Cir. 1989). One circumstance to consider in evaluating sufficiency of notice is whether alleged inadequacies prejudiced the creditor. *Id.* Another circumstance to consider is whether notice was given to the creditor in time for it to take meaningful action in response to the impending deprivation of its rights. *Memphis Light, Gas & Water Div. v. Craft*, 436

U.S. 1, 13, 98 S.Ct. 1554, 1562, 56 L.Ed.2d 30 (1978); *Chicago Cable Communications v. Chicago Cable Commission,* 879 F.2d 1540, 1545 (7th Cir.1989), *cert. denied,* 493 U.S. 1044, 110 S.Ct. 839, 107 L.Ed.2d 835 (1990).

Quite clearly it must be concluded that reasonable notice was not given to TWA or the Allied Companies.

### Pettibone's Objections Under 11 U.S.C. § 502

 Pettibone contends that movants' claims are precluded by § 502(e)(1)(B). That provision directs disallowance of a claim for contribution made by an entity that is liable together with a debtor, to the extent that the claim is contingent as of the time for allowance or disallowance. A claim for indemnification, as well as contribution, has been considered to be for "reimbursement" within the meaning of § 502(e)(1)(B) of the Bankruptcy Code, Title 11 U.S.C. *In re Pettibone,* 110 B.R. 837, 847–48 (Bankr.N.D.Ill.1990).

Section 502(e)(1)(B), however, only applies to a claim "of an entity that is liable with the debtor on ... the claim of a creditor." Here, the original creditor is Hawxhurst, and Hawxhurst was found to have a claim only against a Pettibone's insurance (and against Pettibone nominally for that purpose). He was not allowed to file a late claim against debtor's assets. Moreover, the nature of the original and cross-claim in the Hawxhurst litigation does not permit a present definitive finding that the Allied Companies and TWA are "liable with" debtor "on ... the claim of" the creditor Hawxhurst.

 Even more importantly, the issue now presented is not allowance or disallowance of claims. At this juncture, claimants seek only leave to file their claims, and an opportunity to have the issue of allowance or disallowance treated consistently with other personal injury claims under the Plan that are to be liquidated in another court. By its express terms, § 502(e)(1)(B) authorizes disallowance of claims which are contingent in character "at the time for allowance or disallowance."

Pettibone's assertion that "this point in time [is] the time of allowance or disallow-

ance" (Pettibone's Proposed Conclusions at 6) is incorrect. Section 7.05 of Pettibone's Plan of reorganization provides a mechanism whereby (1) unliquidated PL claims are deemed filed; (2) the bankruptcy stay and statutory injunction upon confirmation were modified to permit such unliquidated claims to be reduced to judgment in other courts; and (3) when liquidated, such claims were to be deemed allowed by further order of this Court. Plainly, the filing of unliquidated PL claims and their allowance after liquidation are separate stages in the determination of PL claims under the Plan. At this juncture, claimants request only the threshold relief of having claims filed, deferring issues as to allowance or disallowance for a later date, in the same manner as other PL claims.

Consequently, the literal conditions of § 502(e)(1)(B) are not met.

 Section 502(e)(1)(B) is not fatal to the claimants here for two other reasons.

First, although the motion to file late claims is being granted, the claims are provisionally disallowed until such time as any of them cease to be contingent. At that time, these claims can be deemed to have been timely filed pre-petition claims for reimbursement.

Under 11 U.S.C. § 502(e)(1)(B) and § 502(e)(2), a claim for reimbursement can be deferred until it is no longer contingent; then it can be allowed as a pre-petition claim. The contingent claim may be disallowed under 11 U.S.C. § 502(e) until such time, if ever, as the co-defendants are all found liable and judgment is recovered from the non-debtor defendants. At that time, pursuant to § 502(e)(2), the reimbursement claims should be deemed effective as of a pre-petition date. 11 U.S.C. § 502(e)(1)(B) and § 502(e)(2). *See* discussion and authorities cited in *In re Pettibone,* 110 B.R. 837, 847–48 (Bankr. N.D.Ill.1990).

 Second, the purpose of and policy underlying § 502(e)(1)(B) is not advanced by Pettibone's suggested interpretation of that section. The concerns of the drafters were twofold. The intent of Congress was to "prevent competition between a creditor and his guarantor for the limited proceeds in the

estate." Notes of Committee on the Judiciary, S.Rep. No. 95–989, quoted in *In re: A & H, Inc.,* 122 B.R. 84, 85 (Bankr.W.D.Wis. 1990). Further, Congress wanted to relieve a debtor's estate from undue burdens resulting from estimated claims which are contingent in nature, and to expedite a debtor's reorganization without delay resulting from unliquidated, contingent liabilities. *In re The Charter Co.,* 862 F.2d 1500, 1502 (11th Cir., 1989). Section 502(e)(1)(B) is also designed to prevent double payment by an estate for the same underlying liability. *In the Matter of Harvard Industries, Inc.,* 138 B.R. 10, 12 (Bankr.D.Del.1992) (citations omitted).

Here, the assets of reorganized Pettibone will not be directly impacted. American Centennial (supplemented perhaps by insurance layers above American Centennial) is responsible for all defense costs and for any judgment or settlement above the SIR (which has already been met).

Pettibone itself is not exposed to any risk of double recovery from these claims. First, its exposure with respect thereto (as distinct from that of its insurer American Centennial) has been liquidated and fixed. Pettibone's exposure on product liability-personal injury claims is limited to its self-insured retention of $773,835.32. Even that burden is shared by successful claimants under the Plan, not by the reorganized Pettibone. While these claims may increase the exposure of American Centennial above the self-insured layer, allowance of these claims will not increase Pettibone's liability exposure a dime. Second, Pettibone's obligation for contribution to the Class 4 fund is fixed by the Plan and will not be affected by these claims. Finally, a claim for contribution in tort, by its very nature presents no risk of double recovery against Pettibone. Contribution facilitates a fair sharing of the burdens of risk and liability. Permitting claimants to present their late claims, late due to circumstances beyond their control, facilitates this equitable apportionment.

Nor will permitting claimants' late filings delay or complicate the debtor's reorganization. The business aspect of the reorganization is complete. As part of reorganization,

the debtor's own exposure for personal injury/product liability claims was liquidated and fixed. While referencing § 502(e)(1)(B)'s purpose in avoiding delay in reorganization, Pettibone offers—and can offer—no reasoned analysis as to how reorganization could conceivably be impaired or delayed here.

In short, it is clear that § 502(e)(1)(B) does not bar the filing of these claims.

### *Is American Centennial Obliged to Defend?*

■ Counsel for Pettibone, funded as they are by American Centennial, also raise the specter that insurance coverage from American Centennial may not be available for this claim. They urge that claimants bear a burden of proof to establish that American Centennial will in fact willingly defend their claims. They also suggest that the burden cannot be met because they, the insurance-funded lawyers for Pettibone, declare that American Centennial will not defend. The argument, however, evades the evidence in the record establishing American Centennial's apparent duty to defend. The insurer is not a party here and has not formally intervened, so it may be that the conclusions here will not be found to bind it. However, this Court cannot disregard American Centennial's obligation to defend that is presently apparent from the evidence.

Pettibone's contrary position derives from language in Section D of the Second Amended Disclosure Statement, prepared in connection with its confirmed Plan of reorganization. It relies on wording that a PL claimant may proceed "upon a finding by the Bankruptcy Court that an insurance company has agreed to defend a PL claim." Pettibone's Proposed Conclusions at 32. However, immediately following that language, the disclosure statement also provides that "the first solvent layer insurers have already agreed to [defend PL claims]."

Ruling on the earlier motion of Robert Hawxhurst for leave to file a late claim, this Court made a Finding of Fact regarding Pettibone's assertion that American Centennial's obligation to defend and indemnify was limited to Schedule III claimants. The same

finding has been made on this record, and it is well to emphasize it:

> ... [W]hile the claims bar filing date was October 11, 1986, the agreement between Pettibone and American Centennial was executed on May 12, 1987, long before the Committee motion to disallow unfiled claims was filed in November of 1987 and allowed March 11, 1988. American Centennial could not have known with certainty, when it entered into the agreement, whether or not more claims would be filed with leave of Court. Indeed, the insurance agreement to defend, as well as the Plan, left open the possibility of allowance of future claim filing. Furthermore, when Pettibone filed its bankruptcy petition, it had $773,835.52 of unused SIR for the 1981–1982 policy year. Schedule III of the confirmed Plan lists 18 filed proofs of injury claims seeking $20,913,516, in the aggregate ... Accordingly, American Centennial had a powerful incentive to enter into the agreement so as to defend against those claims which threatened its policy limit, regardless of whether or not any unfiled claims were subject to disallowance.

The Hawxhurst Order, 156 B.R. 220.

It does indeed appear that American Centennial is obliged to defend. This conclusion is based on the language of American Centennial's step-down agreement to defend under applicable policies which provided that

> there have been filed or otherwise asserted *or may be filed or otherwise asserted* products in general liability lawsuits and claims (collectively "Claims") by certain known and unknown parties ("Claimants") against Pettibone which may be insurer's responsibility under the Policies.

Pettibone Ex. 4, p. 2. While policy defenses having nothing to do with the bankruptcy Plan were preserved under that agreement, the insurer did not thereby eliminate its future liability for claims that had been filed or might be allowed for filing in the future.

Because of the apparently available insurance-funded defense, Pettibone's reliance on *In Re Martha Washington Hospital,* 157 B.R. 392 (N.D.Ill., 1993), and similar authorities is misplaced. In the absence of any

insurer obligated to defend personal injury contribution claims against the estate, the impact of permitting a personal injury contribution claim against the *Martha Washington* estate was clear and immediate. American Centennial's undertaking to defend claims which "may be filed or otherwise asserted" against Pettibone leads to the opposite result here.

■ Pettibone has asserted that the effect of 11 U.S.C. § 1141 is an absolute bar to movants' late claims. Under § 1141(d)(1), plan confirmation discharges the debtor for any debt that arose prior to the date of confirmation except as is otherwise provided in § 1141(d), in the plan itself, or in the order confirming the plan. Under § 1141(d)(1)(A), debts are discharged irrespective of whether (i) a proof of claim based on such debt is filed or deemed to have been filed, (ii) the claim is allowed under § 502, or (iii) the holder of the claim accepts the plan. 11 U.S.C. § 1141(d). However, the step-down agreement was incorporated in the Plan, and the possibility of claims by the Allied Companies, TWA, or others was preserved by being provided for in that Plan. That falls within the § 1141(d) exception.

■ The normal dynamic of relations between claimants, insurer, and insured often result in litigation to determine whether the insurer must defend. The possibility of such litigation is no reason to preclude the claims of the Allied Companies and TWA.

### Authorities Cited by Pettibone
#### 1. *Fairchild*

Pettibone relies heavily on *In re Fairchild Aircraft Corp.,* 128 B.R. 976 (Bankr., W.D.Tex.1991). In *Fairchild,* the movants, personal injury (product liability) plaintiffs who sued the debtor pre-bankruptcy, had actual notice of the bar date more than 20 days before it expired. In that respect, they more closely resemble Hawxhurst than TWA and the Allied Companies. There is no dispute here that these claimants did not have actual notice of the claims bar date until more than four years after its expiration. Moreover, the creditors in *Fairchild* sought to file a late claim under circumstances in

which the corporation had no insurance, was liquidating, and was a mere shell. None of those circumstances exist here.

Noting that Bankruptcy Rule 9006(b) permits late filing of a claim upon a showing of excusable neglect, the *Fairchild* court determined that excusable neglect had not been proven. *Id.* at 984. Significantly, the court cited *Tulsa Professional Collection Services, Inc. v. Pope*, 485 U.S. 478, 491, 108 S.Ct. 1340, 1348, 99 L.Ed.2d 565 (1988) (due process requires actual notice to all appropriate persons whose identity is known or reasonably ascertainable); *In re Spring Valley Farms, Inc.*, 863 F.2d 832, 834 (11th Cir. 1989) ("due process prevents [extinguishing] claims when no notice of the bar date for filing a proof of claim has been sent"); *In re CRC Wireline, Inc.*, 103 B.R. 804, 807 (Bankr.N.D.Tex.1989) ("a known creditor is entitled to actual notice of a Bar Date. Therefore, under constitutional due process requirements, a known creditor must receive actual notice of a Bar Date in order for such creditor's claim to be forever barred") (citations omitted); and *In re Harbor Tank Storage Co.*, 385 F.2d 111, 115 (3d Cir.1967) ("a creditor has every right to assume that he will be sent all notices to which he is entitled"). The *Fairchild* court also emphasized that many cases hold due process is satisfied only if a bar date notice is sent in a manner reasonably calculated to be received. 128 B.R. at 983. Pettibone failed to satisfy due process and provide either TWA or the Allied Companies with notice of the claims bar date. And for reasons earlier discussed, the published notice cannot bar a creditor like TWA from asserting claims it later discovers, or bar known creditors like the Allied Companies.

### 2. Other "Excusable Neglect" Authorities

The other excusable neglect cases cited by Pettibone are not applicable. In *In re Vertientes, Ltd.*, 845 F.2d 57, 60 (3d Cir.1988), the creditor was denied leave to file his claim because of a failure to claim excusable neglect, and because it filed a motion for leave to file an amended claim when no claim had been filed in the first place. The facts here are dissimilar.

*In re Stern*, 70 B.R. 472 (Bankr.E.D.Pa. 1987), involved a motion to revoke an order of discharge in a Chapter 13 case. The creditor's attorney had received actual notice of the bar date, and the creditor argued unsuccessfully that counsel's oversight justified the motion. Citing *Harbor Tank*, 385 F.2d at 114, the court commented that if the case there had different facts and there had been no prior notice of the bar date, an enlargement of time to file a claim might be constitutionally required. 70 B.R. at 475 n. 5. Again, the facts in *Stern* are dissimilar from the case before this Court.

The issues in *Vancouver Women's Health Collective Society, et al. v. A.H. Robins Co., et al.*, 820 F.2d 1359, 1363-4 (4th Cir.1987), cited by Pettibone, concerned the cost and manner of notifying unidentified foreign users of the Dalkon Shield. The court held that the extraordinarily broad worldwide dissemination of information concerning the opportunity to file claims, and the fact that many foreigners had filed claims, warranted a conclusion that foreign users had been sufficiently notified of the pending bankruptcy. In this case, the Allied Companies was a known creditor of Pettibone. Nothing in *Vancouver Women's Health Collective Society* excuses Pettibone from providing actual notice of the bar date to the Allied Companies.

### 3. Delay in Filing

Pettibone also relies on *In re Whitney–Forbes, Inc.*, 770 F.2d 692 (7th Cir.1985). There the Court held that a ten-year delay in bringing a Rule 60(b) motion for relief from judgment confirming a judicial sale was too long. *Id.* at 698. The court emphasized that no due process considerations were present, that the movant had inquiry notice of the sale, and that great prejudice would inure to the debtor if the motion was allowed. *Id.* Here, in contrast, there was not a considerable delay after TWA and the Allied Companies received notice of the bar date. Moreover, these motions are not under Rule 60(b), and TWA at least was not on inquiry notice of the bar date. Significantly, Pettibone shows no material prejudice resulting during the period between the time Pettibone finally provided the Allied Companies and TWA

with notice of the bar date and the time when claimants presented the instant motions.

Pettibone also relies on other precedents. In *Robbins v. Amoco Production Co.*, 952 F.2d 901, 907–8 (5th Cir.1992), actual notice of the bar date was provided in a timely manner to the creditor's attorney. In *In re Chateaugay Corp.*, No. 92 C 8722 (LJF) at 44, 1993 WL 127180 (S.D.N.Y., April 22, 1993), the court held that the creditor itself had timely actual notice of the bar date. Pettibone also cites *In re Dakota Rail, Inc.*, Bankr. No. 4–91–240, Adv. No. 4–88–639 1992 WL 35866 (Bankr.D.Minn., Feb. 18, 1992), where the creditor was unknown to the debtor. None of these decisions involve factual settings analogous to that presented here.

#### 4. *Assertion of Laches*

█ Pettibone argues that the doctrine of laches precludes the Allied Companies and TWA's claims because it will be prejudiced by delay if the Allied Companies' motion is allowed. Yet Pettibone established no prejudice from the delay. Indeed, the "prejudice" it argues (investment of time and possible higher premiums) has not been shown to be of greater magnitude because of delay. Of course, without demonstrated prejudice from delay, laches is not established.

In support of Pettibone's assertion that the doctrine of laches defeats the Allied Companies' motion, it cites such cases as *In re Remington Rand Corp.*, 836 F.2d 825 (3d Cir.1988), and *In re Chicago, Rock I. & Pac. R.R.*, 788 F.2d 1280 (7th Cir.1986).

In *Remington*, the court noted that a four-year delay in seeking leave to file a late proof of claim was not necessarily excessive, and held that the totality of the circumstances must be examined to determine the reasonableness of such a motion. 836 F.2d at 833. In *Chicago, Rock I. & Pac. R.R.*, the Court of Appeals for this Circuit observed that an eight-year delay would not necessarily be too long, and that a reorganization court should be inclined to allow claims to be filed and to relieve claimants from the consequences of missing a deadline. 788 F.2d at 1284–85 (citations omitted). These authorities are actually contradictory to Pettibone's position.

Pettibone also relies on *In re Barsky*, 933 F.2d 1013, Nos. 88–5965, 88–6076, 1991 WL 88170 (8th Cir. May 17, 1991). *Barsky* provides no support for its position. The decision was issued as an unpublished opinion under Ninth Circuit Rule 36–3, which provides expressly that such opinions

> shall not be regarded as precedent and shall not be cited to or by this court or any district court of the Ninth Circuit, either in briefs, oral argument, opinions, memoranda, or orders, except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.

Since *Barsky* has no precedential value in the circuit in which that opinion issued, it has none here.

Moreover, the creditor in *Barsky* received a copy of the debtor's plan but still filed no claim. The Allied Companies and TWA were not provided with the Plan until after filing the instant motions, which was long after Plan confirmation.

Finally, the *Barsky* court found laches because the creditor had deliberately waited to seek bankruptcy court relief until after both the debtor's discharge and termination of the bankruptcy proceeding. This resulted in great prejudice to the debtor. Here Pettibone did not show prejudice from delay. Moreover, under the confirmed Pettibone Plan, claims disputes were to continue after confirmation until all are liquidated. Only after that can a final decree be entered, because the Plan will not have been consummated until then. Accordingly, *Barsky* has no application to these facts.

Pettibone also cites *Greatamerican Fed. Sav. & Loan Ass'n v. Adcock Excavating, Inc.*, No. 89 C 3794, 1990 WL 51219 (N.D.Ill., Apr. 17, 1990). There the reason for failure to send a bar date notice was that the debtor had no knowledge of the creditor's claim. The same cannot be said of Pettibone's knowledge of the Allied Companies' claim.

The case of *In re Flanigan's Enterprises, Inc.*, 77 B.R. 963 (Bankr.S.D.Fla.1987), cited by Pettibone found that the creditor was unknown to the debtor and could not be noticed. However, the court stressed that:

Courts have consistently found the lack of notice to "known" creditors to constitute the paradigm example of excusable neglect and freely grant motions to file late claims on behalf of known creditors who through no fault of their own, had no notice of the bar date.

*Id.* at 965 (citations omitted).

### Authority to Grant These Motions

■ Rule 9006(b)(1) of the Federal Rules of Bankruptcy Procedure expressly confers this Court with authority to entertain requests for exactly such relief. *Pioneer Investment Services Co. v. Brunswick Associates, L.P.*, —— U.S. ——, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993). Pettibone's assertion that the Section 1141 discharge is an absolute bar to movants' late claims entirely evades the equitable inquiry that this Court must make in determining whether to allow late claims. As the Supreme Court noted in *Pioneer Investment,* such an inquiry is especially appropriate in Chapter 11 cases:

The "excusable neglect" standard of Rule 9006(b)(1) governs late filings or proofs of claim in Chapter 11 cases but not in Chapter 7 cases. The rules' differentiation between Chapter 7 and Chapter 11 filings corresponds with the differing policies of the two chapters. Whereas the aim of a Chapter 7 liquidation is the prompt closure and distribution of the debtor's estate, Chapter 11 provides for reorganization with the aim of rehabilitating the debtor and avoiding forfeitures by creditors. In overseeing this latter process, the bankruptcy courts are necessarily entrusted with broad equitable powers to balance the interests of the affected parties, guided by the overriding goal of insuring the success of the reorganization.

—— U.S. ——, ——, 113 S.Ct. 1489, 1495 (footnotes and citations omitted).

The issue before the Supreme Court in *Pioneer Investment* was whether delay occasioned by "neglect" could provide a basis for invoking Rule 9006(b)(1). In the absence of neglect, late filing was permissible because "the movant's failure to comply with the Court's deadlines was caused by circumstances beyond its reasonable control." ——

U.S. at ——, 113 S.Ct. at 1494. TWA had no claim capable of timely assertion when the bar date passed, and the Allied Companies were not informed about the claims bar date or the Plan confirmation process. That certainly establishes circumstances beyond the control of these parties, a most compelling basis for allowance of these late claims.

### Burden of Proof

■ Pettibone asserts that claimants here failed to meet their burden of proof on three issues: (1) to show hardship if not permitted to file the late claims; (2) to show an absence of hardship to Pettibone if the late claims are permitted; and (3) to refute evidence of prejudice to Pettibone. The record contains overwhelming evidence to the contrary.

Potential hardship to claimants is obvious. They were impleaded into a serious personal injury lawsuit, allegedly caused by a defective Pettibone baggage tractor. If not permitted to file their claims herein and pursue claims for contribution against Pettibone, they may face the full impact of a tort judgment without recourse against Pettibone. The prejudice of that increased exposure is self-evident.

Claimants also adduced evidence, largely through stipulated facts, showing absence of prejudice to Pettibone. Under the Plan of reorganization herein, Pettibone's liability for PL claims was virtually eliminated, even for the amount of its self-insured retention (which has already been exhausted by other allowed claims). Allowance of the present claims may change the amount of the SIR allocated to each successful PL claim, but it will not affect Pettibone's liability up to the amount of the SIR. The increased liability exposure presented by these claims will be borne by Pettibone's PL insurance carrier for the policy year in question, American Centennial. Accordingly, there will be no adverse financial impact on reorganized Pettibone from allowance of TWA's claim.

Finally the record refutes the nominal claims of prejudice asserted by Pettibone at trial. Time devoted by Pettibone personnel to defense of the present claims is simply a

normal incident of litigation, which reorganized Pettibone undertook in its Plan of reorganization. Section 7.05 of the Plan required reorganized Pettibone to cooperate with its PL insurance carriers in the investigation and defense of PL claims. Pettibone Ex. 2, p. 21. Pettibone's evidence that allowance of this claim would prospectively increase its costs of acquiring insurance was speculative, as discussed earlier.

Reviewing the record as a whole, claimants established the prejudice it faces in the absence of relief, the lack of any material financial impact on reorganized Pettibone, and the *de minimis* and vague character of the prejudice claims asserted by Pettibone. Claimants have sustained their burden of proof on this motion.

### Asserted Prejudice to Pettibone's Insurer Does not Bar the Motions

Pettibone's assertion that prejudice to its insurer is tantamount to prejudice to itself is plainly at odds with authority of this Circuit as embodied in *Fernstrom* and its progeny. Even more fundamentally, however, the assertion of prejudice to American Centennial, which devolves to detriment of reorganized Pettibone, overlooks the record in this case. Underlying all claims of prejudice to American Centennial is the assertion that the insurer had a settled expectation that it was dealing with a defined body of product liability and personal injury claims at the time it entered into its step-down agreement as an element of Pettibone's Plan of reorganization. However, as previously discussed, that premise is inconsistent with the step-down agreement, which contemplated the possible filing of additional claims, the Plan allowing for such future filings and providing for their liquidation, and the confirmation order.

Having contracted to insure and defend claims both "filed or otherwise asserted" and others which "may be filed or otherwise asserted", American Centennial did not enter into the insuring agreement in reliance only upon a known set of claims. The language of the step-down agreement represents a practical and realistic recognition of this Court's authority under the Bankruptcy Rules to allow the filing of late claims. Pettibone cannot claim that American Centennial had a settled expectation that it contracted to insure only a limited and defined set of claims in its insuring agreement. Accordingly, cases such as *In Re Fairchild Aircraft Corp.*, 128 B.R. 976 (Bankr.W.D.Tex.1991), predicated on findings that an insurance carrier had relied on existence of a limited body of claims, are plainly distinguishable.

### CONCLUSION

For the foregoing reasons, the TWA and Allied Companies' motions for leave to file late proofs of claim will be granted by separate judgment orders to be entered. Pursuant thereto, TWA and the Allied Companies may, notwithstanding Plan confirmation and 11 U.S.C. § 524 and § 1141, continue their non-bankruptcy cross-claims against Pettibone in the New York Court.

TWA and the Allied Companies may also have full rights as Class 3 and Class 4 creditors to the extent their cross-claims ultimately prevail. However, they may recover no more than if they had timely filed their allowed claims herein. Further, their recovery, if any, will be limited by the same conditions as to payment and procedures as are imposed on timely filed claimants under the Plan.

However, this Court lacks jurisdiction to annul the stay after confirmation on motion of the Allied Companies. *Pettibone Corp. v. Easley*, 935 F.2d 120 (7th Cir.1991). Moreover, the Allied Companies' counsel were well aware of the pendency of the Pettibone bankruptcy proceeding. Should any litigation activity be a nullity by reason of the stay and their disregard of it, that would not entitle them to annulment in that circumstance.

The judgment orders will provide for the actual filings of specific claims in this proceeding within seven days of the order, with service of copies thereof.

Upon such filings, the judgments will further provide that the injunctive effect of the confirmation order will not prevent these claimants from full pursuit of their cross-claims in the state court.

Counsel for the Allied Companies and TWA are required to submit separate proposed final and appealable judgment orders in accord with the foregoing rulings.